STATE of Tennessee, Appellee,

v.

Richard C. TAYLOR, Appellant.

Supreme Court of Tennessee,
at Nashville.

April 17, 1989.

Michael P. Williamson and Thomas W. Watson, Nashville, for appellant.

W.J. Michael Cody Atty. Gen. & Reporter and Miriam Nabors Banks, Asst. Atty. Gen., Nashville, for appellee.

OPINION

COOPER, Justice.

This is a direct appeal from the sentence of death imposed on the defendant, Richard C. Taylor, for the killing of Ron Moore, a Department of Corrections guard working at the Turney Center in Hickman County where defendant was an inmate. The defendant questions the sufficiency of the evidence, rulings by the trial court on pretrial motions, on *voir dire*, the admission of evidence, the argument to the jury by the State, and the court's instructions to the jury. The defendant also insists that the sentencing provisions of the Tennessee Death Penalty Act, T.C.A. § 39–2–203, are unconstitutional.

After consideration of the several issues and of the entire record, we are of the opinion that no reversible error was committed in either the guilt or sentencing phase of the trial, that the verdict and sentence are sustained by the evidence, and that the sentence of death under the circumstances of this case is in no way arbitrary or disproportionate. *See State v. Sutton*, 761 S.W.2d 763 (Tenn.1988) (stabbing death of prison inmate by fellow prisoner).

Corrections Officer Moore was stabbed to death on the night of August 28, 1981. It is undisputed that the killer was the defendant, Richard C. Taylor. The issue raised in defense of the murder charge was that defendant was insane at the time of the homicide.

The record shows that Mr. Taylor believed that he had been treated unfairly by Officer Moore on several occasions. Defendant blamed Moore for preventing defendant from receiving a stereo and television set left to him by an inmate who had been transferred from the Turney Center. On the day of the killing, Moore reprimanded the defendant for failing to properly clean the hall. The incident that "set off" defendant, however, occurred an hour or

two before the killing when Moore removed a towel that another inmate, Tony Bedwell, had hung over the window in a cell door to dry and pushed the towel under the door. When Bedwell asked Moore what was going on, Moore explained the regulations against covering the window in the cell door. To Bedwell, the incident was "nothing big," but defendant, who had seen what happened, advised Bedwell to "kick [Moore] up the side of his head." Bedwell next saw the defendant when he and Wayne Patterson came to Bedwell's cell to ask if Bedwell had a knife.

Around 9:00–9:30 p.m., the defendant approached Moore as he stood talking to some inmates, cursed and asked Moore, "Now what are you going to do, S.O.B.?" Defendant then grabbed Moore and began to stab him repeatedly with a prison-made knife. Pleading with defendant to stop, Moore retreated down the hall. Defendant continued to hold to Moore and continued to stab him. Other inmates protested and tried to come to the aid of Moore, but were warned off by defendant brandishing his knife.

After the stabbing, defendant returned to his cell block, where he concealed the knife in a closet and changed his clothing. Officer Moore died about forty minutes later in the prison infirmary from internal bleeding caused by a wound that had penetrated his inferior vena cava. He also had suffered potentially fatal stab wounds to the pancreas and the spleen.

Several inmates described defendant's appearance and actions. According to inmate Patterson, the defendant was "hyper" and nervous. After the killing the defendant walked around the hallway "in shock," disoriented, bumping into people and the wall. Patterson said defendant was shaking and trembling, with an "expression on his face like a wild horse." The officers who apprehended defendant after the killing, however, while remarking that he was shaking and stuttering and appeared nervous, said that defendant was not confused, was responsive, coherent and understood their questions. Defendant indicated he understood his rights and signed a waiver but refused to sign a confession or allow his confession to be written down.

The defendant offered to cooperate if the officers would get his blue jeans and television. When asked why he had stabbed Moore, defendant said that he "thought it was his daddy." When asked another time why he had attacked Moore, defendant said he had become angry when he had seen Moore pull the towel from Bedwell's door and made up his mind "that that would be the last time he [Moore] would mess with anybody."

The State introduced in evidence several letters the defendant had written shortly after the killing to friends who were inmates. In them, defendant shows an awareness of his actions and explains his motives for the killing. (*E.g.*: "It's hard to say why I took Moore's life. Let's just say that I'm not a gopher. There's something I just don't go for."; "I just want you to know that the main thing behind killing that guard was just that, the killing." "Hey, I went in there to see that TBI man and put a crazy act on him. And, hey, my past mental record will put a lot of shit into this game, Rap."; "Hell, I must have stood there with the shank in my hands for about five minutes before Moore looked away. And then I said, 'Wham, now, mother fucker, what are you going to do.' That Moore just looked at me and started running up, up that hall and I ... was right behind him, then grabbed him by his collar and let out a roar like a lion and was shanking the hell out of him until you run up and got me to stop."; "I told those boys ... that I did it and I told a couple of guards that I did it, but they ain't got no taped or written statements and that's what counts.")

Taylor, who was twenty-one, had a history of juvenile problems and mental and emotional difficulties that had led to several mental evaluations before the killing of Officer Moore. He had been in the drug and alcohol abuse program at the DeBerry Correctional Institute, a state facility for prisoners with psychiatric problems, before coming to the Turney Center. As a result of his having swallowed broken glass, defendant was incarcerated in West–100, the

section of the main penitentiary in Nashville for prisoners with mental problems, from late May 1981, until July 2, 1981, when he was returned to the Turney Center. Defendant had been on several anti-psychotic drugs over this period but there was no record of his receiving any medication on the date of the killing.

Defendant's fellow inmates described him as a loner, moody, and strange. He was characterized as "hyper all the time." One inmate stated, "Richard is a nice guy when he's ... got his medicine. When he ain't got his medicine, you don't want to mess with him." He had been involved in several incidents of violence toward fellow inmates and the prison staff.

Two attorneys described the defendant's excited and disoriented manner when they had met him three or more months after the killing. He told them a "breathing voice" (he described as his father's) had told him to stab Moore. He claimed to have a difficult time remembering what occurred on August 19. Chip Burson, coordinator of psychological services at the maximum security ward at the main prison while defendant was there in June 1981, testified that defendant had been reclusive, agitated, disoriented, and shaky. He was seen talking to himself in his cell, and Burson had felt he should have been transferred to DeBerry.

After reviewing the defendant's history and institutional record, defense expert Dr. Michael Stein, a psychologist who had conducted a six-hour clinical interview of and administered two tests to the defendant on March 30, 1984, diagnosed defendant as suffering from borderline personality disorder, paranoid personality disorder and brief reactive psychosis. He opined that at the time of the killing defendant was suffering from a psychotic episode as the result of a mental disease or defect and could not therefore appreciate the wrongfulness of his acts or conform his conduct to legal norms. Dr. Stein explained that the letters were the defendant's attempt to establish an identity as a "macho convict criminal type" to compensate for the weak sense of identity common to borderline personali-

ties. On cross examination, however, Dr. Stein admitted that defendant also met most of the diagnostic criteria for an antisocial personality.

A second defense expert, Jonathan Lipman, a doctor of pharmacology with a specialty in neuropharmacology (the study of the effect of drugs on the brain), testified about the effect of anti-psychotic or neuroleptic drugs like those taken by the defendant on the brain and about these drugs' side effects, such as shaking and grimacing, indicative of tardive dyskinesia. Dr. Lipman also testified about supersensitivity psychosis, a psychosis caused by the withdrawal of anti-psychotic drugs from someone who had been taking them for some time, and noted that defendant's history indicated he could have been suffering from such a psychosis at the time of the killing.

The State presented the testimony of two experts, Dr. John Filley, a psychiatrist at the Middle Tennessee Mental Health Institute, [MTMHI] who had examined defendant on two occasions, and Dr. Mohammad Rahib, a psychiatrist who had examined defendant in late 1979 and early 1980. Both men diagnosed defendant as having an antisocial personality disorder, and Dr. Rahib stated there was little substantiation for the theory of supersensitivity psychosis. Neither believed defendant was suffering from a mental disease or defect that met the standards of *Graham v. State*, 547 S.W.2d 531 (Tenn.1977).

In surrebuttal, defendant presented Dr. Jan Mayer, a psychiatrist, who testified that the concept of supersensitivity psychosis was accepted by some members of the medical-scientific community and not by others. Dr. Patricia Corey, a psychiatrist who had examined defendant at MTMHI in late 1979, recounted defendant's bizarre behavior at that time and her initial diagnosis of psychosis associated with drug (amphetamines) intoxication.

[As a part of its proof, the defense also introduced defendant's 1980 convictions for joy riding and simple robbery to explain why he was incarcerated at the Turney Center.]

The State presented no further proof at the sentencing hearing. The defendant presented three witnesses—Dorothy Greer, Assistant Commissioner for Adult Services in the Department of Corrections, who was questioned about her remark at a legislative hearing that in the defendant's case "I think we did fail;" Jeff Blum, a staff member of the Southern Prison Ministry, who testified about the circumstances of confinement that put the defendant under pressure on August 29, 1981; and Josie Pruett, the defendant's aunt, who testified about the defendant's childhood. From Mrs. Pruett's testimony, the jury was informed that the defendant was an adopted child, who had shown signs of hyperactivity from infancy. His parents had been inconsistent in disciplining him and had not supported him when he became involved in more and more difficulties as he grew up. Defendant had had no contact with his parents after he went to prison.

The jury found from the evidence that the defendant was guilty of murder in the first degree in killing Ron Moore, and in a separate proceeding, sentenced defendant to death. In imposing the death penalty the jury found four aggravating circumstances: (1) the defendant previously had been convicted of a felony that involved the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed by the defendant while he was in lawful custody or in a place of lawful confinement; and (4) the murder was committed against a corrections employee, who was engaged in the performance of his duties, and defendant knew that the victim was a corrections employee engaged in the performance of his duties. T.C.A. § 39–2–203(i)(2), (5), (8) and (9). The jury also found that the aggravating circumstances outweighed mitigating circumstances. T.C.A. § 39–2–203(g).

A number of issues have been raised that have a bearing on the overriding issue of sufficiency of the evidence in both the guilt and sentencing phases of the trial. The defendant insists that the trial court committed prejudicial error in admitting in evidence the letters written by defendant to fellow inmates. Defendant insists that the seizure of the letters violated his First Amendment right to freedom of speech under *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and his Fourth Amendment right to be free from unreasonable search and seizure under *United States v. Savage*, 482 F.2d 1371 (9th Cir.1973).

Proof on this issue shows that pursuant to formal procedure structured by department policy, Warden Rose of the main prison in Nashville had all of defendant's incoming and outgoing mail (except that addressed to attorneys and the courts) read to see if defendant posed any security problems or threatened the safety of prison employees or other inmates. The letters were copied and replaced in their envelopes and then returned to the prison post office. Copies of letters addressed to inmates at the Turney Center were sent to Warden Garrington for him to determine if any threat existed to security at that institution. Warden Garrington had never requested that any of the letters be sent to him. In a cover letter Warden Rose suggested that Garrington might want to pass the letters on to the TBI agent handling the case, which he did. Some of the letters did contain threats against Turney inmates for "snitching" on the defendant.

*Procunier, supra,* addresses circumstances under which it is appropriate to censor a prisoner's mail. That is not what occurred here although *Procunier* supports the conclusion that defendant's mail was opened for permissible reasons, *i.e.,* prison mail may be censored where the practice furthers an important or substantial governmental interest unrelated to the suppression of expression, one such interest being the protection of institutional security and the safety of employees and other inmates and the insurance of order. 94 S.Ct. at 1811–1812.

*United States v. Savage, supra,* the case cited by defendant to support suppression of the letters under the Fourth Amendment held that absent a showing of some justifi-

able purpose, the interception and photocopying of a prisoner's letter to an inmate at another institution is violative of the Fourth Amendment. In the early case of *Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), the Court held that there was no unreasonable search and seizure where a prisoner's letters were turned over to the warden "under the practice and discipline of the prison." A similar conclusion was reached in *Hicks v. State*, 480 S.W.2d 357 (Tenn.Cr.App.1972). As *Savage* indicates the *Stroud* holding has been questioned in light of recent developments in Fourth Amendment law and the *Procunier* decision. *See* 4 LaFave, *Search & Seizure* § 10.9(c) (2nd ed. 1937); *see also* Annot., 52 A.L.R.3d 548 1973, for a general discussion of the issue. However, under the facts of this case, *Savage* does not require the suppression of the letters written by defendant. We find no violation of the Fourth Amendment.

Defendant argues that he was unfairly prejudiced by inflammatory language in the letters, and for that reason the letters should not have been admitted in evidence. Defendant makes no specific claim as to which parts of the letters were unduly inflammatory. Redacted versions of the letters were read into evidence during the guilt phase of the trial by TBI Agent Tenry. They were relevant to both defendant's guilt and his state of mind regarding punishment. We find no abuse of discretion on the part of the trial court in admitting the letters in their redacted versions and that their probative value was not unfairly outweighed by their prejudicial aspects.

The defendant insists that the trial court erred in admitting in evidence the statements he made to investigating officers on the night of the killing. He argues that the statements were involuntary, induced by his mental state and by the treatment of guards who initially apprehended him. He also contends that he had not been properly advised of his *Miranda* rights at the time he gave the statements. The trial court found no merit in these arguments, and neither do we.

It is unrefuted in the record that defendant was given his *Miranda* rights, including his right to an attorney, by the guards who apprehended him and by the sheriff and TBI agent who interrogated him, and that the defendant signed a waiver of rights. Further, there is evidence which the trial judge accepted that defendant, though nervous and agitated, voluntarily, knowingly, and intelligently waived these rights and voluntarily made statements to the investigating officers.

The defendant also sought to have the trial court suppress the statements on the ground of undue delay in taking him before a magistrate. The record shows that the officers concluded that since defendant was already incarcerated he need not be arrested and brought before a magistrate. This conclusion was later communicated to the district attorney general. Defendant was indicted early in November and arraigned on November 5, 1981.

■ On these facts, the trial court held that defendant should have been taken before a magistrate, but, recognizing the officers' good faith in not doing so, refused to suppress anything said or written between the event and 9 a.m. the next day, when it would have been feasible to bring defendant before a magistrate. We see no error in the trial court's ruling. The delay in taking defendant before a magistrate was not a tool used to induce the confession, *see Tines v. State*, 203 Tenn. 612, 315 S.W.2d 111 (1958); and it did not affect the voluntariness of the confession. *See State v. Readus*, 764 S.W.2d 770 (Tenn.Crim.App. 1988) (app. denied 1989).

■ Defendant also insists that the trial court erred in admitting into evidence statements of Officer Moore as he died. In response to the prosecutor's questions about what Officer Moore said as he lay dying, inmates and officers from the Turney Center testified that after the stabbing Moore had told them that he felt a pain or burning sensation inside him and that he could not see. These statements fell within the hearsay exceptions of excited utterance, *see State v. Meadows*, 635 S.W.2d 400, 403–404 (Tenn.Crim.App.1982); Paine,

Tennessee Law of Evidence § 66 (1974), and declaration of present physical condition, Paine, *supra*, § 76, as well as the res gestae exception. There was no violation of the confrontation clause because the deceased was unavailable to testify. *See Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Defendant also says the statements were irrelevant and highly prejudicial. However, at no point did he object to the questions eliciting the statements.

■ The defendant sought to introduce findings of fact made by a federal district judge in a civil action regarding conditions in the Tennessee Department of Corrections. The trial court ruled that the conclusions reached by the federal judge based on evidence presented in another case were hearsay and not competent evidence. The defendant insists that the ruling was erroneous and prejudicial. We see no error in the ruling. *Cf. State v. McKay*, 680 S.W.2d 447, 454 (Tenn.1984). Furthermore no prejudice could result to the defendant from the exclusion of the opinion as defendant had the opportunity, and took it, to examine the Warden of Turney Center concerning the conditions that existed in that institution at the time of the killing.

■ The defendant insists that the trial court erred in denying his motion to require the State to give notice of any mitigating factors known to the State. Under the due process clause of the 14th Amendment the State must disclose to a defendant favorable evidence material either to guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant, however, has not identified any favorable evidence withheld by the State. While defendant surely is entitled to any evidence of mitigation possessed by the State under *Brady*, we find no reversible error in the present case on this issue. *See State v. Teague*, 645 S.W.2d 392, 396–397 (Tenn.1983).

■ The defendant also complains of the failure of the trial court to require the State to provide the defendant with the statements of witnesses *prior* to trial. Defendant correctly concedes there is no requirement that witnesses' statements be given to defendant before trial under Tenn. R.Crim.P. 26.2(a), *see State v. Williams*, 645 S.W.2d 258, 260 (Tenn.Crim.App.1982), but argues without specifically applicable authority that, since a heightened degree of due process should be observed in capital cases, the rule should be different in these cases. We know of no constitutional requirement that the State provide witnesses' statements prior to trial. The rule is clear that the State has no obligation to produce statements of a witness until the conclusion of the witness' testimony on direct examination. Tenn.R.Crim.P. 26.2(a); *State v. Robinson*, 618 S.W.2d 754, 757–758 (Tenn.Crim.App.1981). This the State did in this case.

■ Defendant also contends that the trial court did not appoint sufficient experts, including a psychologist, to assist the defendant in defense of the charges against him. Although defendant briefly mentions the right to expert assistance in general, the issue is in fact directed to his entitlement to the assistance of a psychiatric expert.

*Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), decided two years after the trial in this case, holds that when a defendant has demonstrated that his sanity at the time of the offense will be a significant factor at trial, the State must, as a minimum requirement, assure the defendant access to competent psychiatrists who will conduct appropriate examinations and assist in the evaluation and preparation and presentation of the defense. 470 U.S. 68, 82, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). *Ake* sets no specific timetable for the appointment of psychiatric experts, only that defendant have access to a competent psychiatrist to assist in the defense.

Anticipating a decision like *Ake* the trial court initially appointed Dr. Patricia Corey in April, 1982, to serve as a psychiatric consultant to the defense. Dr. Corey

served in this position until November 29, 1983, when she was removed by the trial court as the result of the State's motion to reconsider its previous order. The trial judge was of the opinion that the appointment had been premature because the defendant had not yet received a psychiatric evaluation at Middle Tennessee Mental Health Institute. In February 1984, after defendant's evaluation, the trial court still refused defendant's motion to authorize psychiatric assistance. Shortly before trial, on April 20, 1984, however the trial court authorized the provision of funds for psychiatric assistance (Dr. Mitchell Stein). Drs. Stein and Corey and other experts such as Chip Burson, Jonathan Lipman, and Dr. Jan Mayer testified for the defendant at trial and there is no indication in the record the time of appointment affected the experts' ability to testify, or ability to advise defendant in his defense. In short, the fundamental fairness requirements of *Ake* were met.

Defendant contends that the procedures to determine competency followed in this case were so inadequate as to violate due process and, as a result, sufficient evidence of competency was not submitted to the trial court. He also contends that he had a constitutional right to be reevaluated regarding competency when it became apparent during the trial that he had not been properly evaluated.

Defendant first requested a mental evaluation hearing in March 1982; and on April 12, 1982, the trial court ordered his transfer to Middle Tennessee Mental Health Institute (MTMHI). Because the indictment against the defendant was dismissed, the defendant's evaluation was suspended apparently pursuant to regulations that charges must be pending for such evaluation. *See* T.C.A. § 33–7–301.

Finally, in November 1983, after defendant had been reindicted, the trial court again ordered defendant's transfer to MTMHI for a mental competency evaluation. Dr. Filley interviewed defendant at MTMHI on December 7, 1983, and again on January 25, 1984, for approximately an hour and a half each time. He investigated defendant's responses "about his present circumstances, about the time of his charges in the present case," and observed the mental status of defendant whom he found to be nervous but capable of responding coherently and rationally. Dr. Filley discussed "trial circumstances" with the defendant but left the investigation regarding competence primarily up to Dr. Glen Watson, a clinical psychologist, who conducted one test with the defendant before the defendant refused to allow any further tests. Dr. Filley reviewed Dr. Watson's conclusion that the defendant was competent to stand trial and talked with the defendant "about his understanding of his situation at some length." He concluded that defendant's need for immediate gratification might cause some difficulty in his conferring with his attorneys, but gave an unqualified opinion in his report to the court that defendant was competent to stand trial, that he understood the charges against him and their consequences and that he was able to advise his counsel and participate in his defense.

At a hearing on February 22, 1984, the defendant challenged the adequacy of the evaluation and requested additional evaluation as to sanity at the time of the offense. Counsel, however, did not specifically argue that defendant was not competent, his major concern at that time being the appointment of a psychiatric expert to assist in the defense.

The competency issue was raised again on the first day of the trial. Counsel for defendant stated that he had serious doubts about defendant's competency based on his "total experience with [defendant] and what's happened the last couple of days and what's going on this morning." Counsel never gave any specific reason for his doubts but the problem appears to be defendant's general uncooperativeness and his disagreement with counsel "about pretty much everything." The trial court gave Dr. Stein, defendant's psychologist, time to examine the defendant. When the court inquired about the progress of the evaluation, counsel stated that defendant refused to talk with Dr. Stein and offered nothing further. The judge then addressed the de-

fendant who asserted that he was mentally sound, but refused to answer when asked if he understood the charge against him. The defendant, however, was able to discuss his wearing shackles and wanting to dress in "civilian" clothes. Based on his observations of defendant and the previous evaluation of defendant's competency, the trial court did not order a reevaluation of competency, but permitted the trial to continue.

In determining defendant's competency to stand trial, factors such as the defendant's irrational behavior, his demeanor at trial and any prior medical opinion are all relevant, *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975). These factors were considered by the trial court in denying the motion to reevaluate the defendant's competency. We find no error in his action. *See Berndt v. State,* 733 S.W.2d 119, 122 (Tenn.Crim. App.1987); *Mackey v. State,* 537 S.W.2d 704, 707–708 (Tenn.Crim.App.1975).

Defendant also asserts that the trial court committed prejudicial error in requiring defendant to appear shackled in court and in allowing the jury to see him in shackles, in prison clothing and under guard violated defendant's constitutional right to a fair trial. We see no merit in this issue. First of all, the facts shown by the record do not support defendant's allegations. Upon being polled at the close of the trial, the jurors stated that they had not seen the defendant in shackles or leg irons during the trial. (They were used on defendant but were screened from the jury's view.) Further, defendant was not "compelled" to wear prison garb. Nor under the circumstances of this case did the presence of guards prejudice defendant. *See Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

The defendant complains of statements of the District Attorney General in the closing argument to the jury in the guilt phase and in the sentencing phase of the trial. Defendant claims the cumulative effect of the alleged errors was sufficient to rise to a constitutional violation. Defendant also charges that the argument of the District Attorney General was calculated to lead the jury to believe they had a duty under the law to sentence Richard Taylor to death. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We find no prejudicial error in the arguments made by the District Attorney General. Statements complained of were fairly warranted by the facts and evidence of the case and, in more than one instance, were made in response to defense argument. Further, we find no statement in the argument that, when considered in context, could be interpreted as an attempt to get the jury to delegate its responsibility for sentencing defendant.

Defendant also charges that the trial court violated defendant's constitutional rights by refusing to allow defense counsel to argue mercy as a mitigating factor. We find no factual basis for the charge. The record shows that defendant's counsel was allowed to argue for mercy and forgiveness in closing argument in the sentencing hearing.

The defendant also has raised several questions concerning the jury instructions in the guilt phase of the trial. Defendant asserts that the instructions given violated his constitutional rights by eliminating the option of jury nullification and by destroying the effectiveness of other instructions that the jury is the judge of both the law and the facts. Defendant expressly complains of two instructions:

> If you should be satisfied from the proof beyond a reasonable doubt that the Defendant did commit an offense charged or included in the Indictment, you should so find.

and:

> If you find from the proof, beyond a reasonable doubt that the Defendant is guilty of murder in the first degree, you will so report in your verdict.

Neither of these instructions violated Article 1, § 19, of the state constitution and *Ford v. State,* 101 Tenn. 454, 47 S.W. 703 (1898), by eliminating the right of the jury to be the judge of the law in contradiction of the trial court's previous instruction that

"you are the exclusive judges of the law under the direction of the Court." *See Judge v. State,* 539 S.W.2d 340 (Tenn.Crim. App.1976).

■ On the issue of jury nullification, although juries sometimes find contrary to the applicable law and evidence of a case, a trial court should not, as defendant seems to be demanding, inform a jury that it may disregard applicable law in reaching its verdict. *Janow v. State,* 567 S.W.2d 483, 485 (Tenn.Crim.App.1978).

■ Defendant insists that the instruction that the jury should not speculate on the conditions of confinement or the possibility of parole violated defendant's constitutional rights. Despite the phrasing of the issue, defendant actually argues that the trial court should have instructed the jury on the possibility of parole if the defendant received a life sentence and allowed proof and argument on this issue because "human nature dictates it is one of the factors which [each] juror will consider" despite instructions to the contrary.

The instruction given was accurate and properly did not mention the possibility of parole. *Cf. Edwards v. State,* 540 S.W.2d 641, 648–649 (Tenn.1976) (effect of verdict not proper for jury consideration); *State v. Moore,* 596 S.W.2d 841, 845 (Tenn.Crim. App.1980) (no error in not instructing on parole).

The defendant complains of the trial court's instruction regarding evidence of defendant's mental status. Defendant contends that the phrase "immediately after" in the instruction that "in determining the defendant's mental status at the time of the alleged crime, the jury is entitled to look to evidence of his actions and words before, at and immediately after the commission of the alleged crime," precluded the jury from considering evidence of defendant's behavior occurring after but not immediately after the offense in violation of the principle in *State v. Haun,* 695 S.W.2d 546 (Tenn.Crim.App.1985), that evidence of mental illness during defendant's lifetime is relevant on the issue of insanity. We find no merit in defendant's contention. Defendant had expressly requested the in-

struction given (part of T.P.I.–Crim. 36.06). Furthermore, in the context of the entire charge on this subject, the instruction did not impermissibly narrow the jury's consideration of the evidence on this issue.

■ Further, the defendant questions the instruction that, in weighing a witness's testimony regarding sanity, the jury could consider whether a witness had observed "extraordinary or bizarre acts" by defendant. Defendant contends that the instruction was overly vague because the phrase "extraordinary or bizarre acts" was not defined and because it misled the jury by implying that a finding of insanity was predicated on "bizarre" acts by the defendant. The defendant affirmatively requested this instruction (T.P.I.–Crim. 36.06), which is not misleading in context. Furthermore the phrase "extraordinary or bizarre acts" is not unconstitutionally vague.

■ The defendant also insists that the use of the phrase "presumption of malice" in instructing the jury as to the elements of murder in the first degree, impermissibly shifted the burden of proof of a necessary element of the offense of murder in the first degree to defendant. The instructions regarding malice given by the trial court, are similar to those found to be constitutionally infirm in *State v. Martin,* 702 S.W.2d 560, 564–565 (Tenn.1985), under *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) and *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Nonetheless in light of the overwhelming proof of malice in this case (*e.g.* his searching out the knife and victim, the repeated stabbings, his comments that he hoped the victim died and his statements in his letters), the error is harmless beyond a reasonable doubt under *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

Defendant further contends that the trial court improperly denied his requested jury instructions numbers 2–6 on the elements of first degree murder, premeditation, deliberation, and "benefit of the doubt" on whether the offense was first or second-degree murder. We find no error in the

denial of these requests. The instructions given the jury adequately covered these matters and fully and fairly stated the applicable law. *See Edwards v. State*, 540 S.W.2d 641, 649 (Tenn.1976); *Bostick v. State*, 210 Tenn. 620, 360 S.W.2d 472, 477 (1962).

■ Citing *Davis v. State*, 161 Tenn. 23, 28 S.W.2d 993 (1930), the defendant claims he was entitled to an instruction (Requested Jury Instruction Number 10) to the effect that even though not insane, he could still be guilty of a lesser offense if because of mental impairment he was unable to develop the necessary elements of malice and premeditation. This is the so-called limited defense of diminished capacity, which it is commonly said is not recognized in Tennessee. *See State v. Taylor*, 645 S.W.2d 759, 763 (Tenn.Crim.App.1982). The substance of Requested Instruction 10 does not directly concern this defense but addresses instead "the implications" of the withdrawal of defendant's medication. The law of Tennessee on the elements of first degree murder was fully and accurately covered in the charge given. The defendant, however, claims that refusing to charge on diminished capacity meant that the jury either had to find the defendant not guilty by reason of insanity or guilty of first degree murder. The trial court fully charged the jury on all the elements of first degree and second degree murder and all lesser included offenses, and the absence of an instruction on "diminished capacity" did not preclude the jury's finding defendant guilty of a lesser offense.

■ The defendant also asserts that the State failed to carry its burden of proving the several aggravated circumstances found by the jury and which were the basis of the jury's sentence of death. Defendant argues in effect that the State can not rely on evidence introduced during the guilt phase of the trial to prove the aggravating circumstances, but must reintroduce relevant evidence in the sentencing phase. The jury that tried the guilt phase of the case is the same jury that heard the evidence in the sentencing hearing. It would be of no advantage to either the State, the defen-dant, or the jury to reintroduce evidence that the jury already had heard. Recognizing this, T.C.A. § 39–2–203(e) provides that the jury is to be instructed in the sentencing hearing to consider evidence introduced at either the guilt or sentencing hearing or both. In this case, the State expressly relied on the evidence presented at the guilt hearing, which it had the right to do.

■ Defendant specifically challenges the sufficiency of evidence to support the jury's finding that defendant had been previously convicted of one or more felonies involving the use or threat of violence to the person. Defendant insists that the crime he committed was simple robbery and it was incumbent on the State to prove that it was accompanied by violence or the threat of violence.

The parties stipulated that the defendant had been convicted of simple robbery. No evidence of the circumstances of the offense was presented, but it was not necessary since simple robbery, by definition, is the felonious and forcible taking from the person of another, goods or money of any value, by violence or by putting the person in fear. T.C.A. § 39–2–501. *See also State v. Moore*, 614 S.W.2d 348, 351 (Tenn. 1981). The fear constituting an element of robbery is a fear of bodily injury and of present personal peril from violence offered or impending. *See Sloan v. State*, 491 S.W.2d 858 (Tenn.Crim.App.1973).

■ Defendant also insists that the evidence was insufficient to sustain the jury's finding that the murder was heinous, atrocious or cruel in that it involved torture or depravity of mind. We find no merit in this insistence either. The proof establishes an especially cruel murder involving torture or depravity of mind. The defendant waited behind the victim for an opportune moment to strike. When he did, he took the victim by surprise and drove the prison-made knife into the victim's back. The victim turned in terror, and attempted to flee, screaming for mercy. The defendant held onto Officer Moore and continued to plunge the knife repeatedly into Officer Moore's body. Officer Moore lived some 30 to 40 minutes after the stabbing, and

complained of burning inside his body and of being unable to see. The defendant stated immediately after the stabbing that he hoped Officer Moore died. Later, in letters, the defendant stated that he had enjoyed the killing.

 The defendant further complains that the State's reliance on the three aggravating circumstances, T.C.A. § 39–2–203(i)(2) [previous violent felony conviction], (8) [occurred while in a place of lawful confinement], and (9) [victim was corrections officer] was an unconstitutional, multiple charging of the same aggravating circumstance. There is no merit in this complaint. The aggravated circumstances charged, proven and found by the jury are fully independent of one another.

The defendant also charges that the fourth aggravating circumstance found by the jury—T.C.A. § 39–2–203(i)(5) ["heinous, atrocious or cruel ..."] is unconstitutionally vague and overbroad. The present case was tried before the decision in *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), wherein this Court held that the instructions to the jury on this aggravating circumstance should also include definitions of each of the terms. However, prior to the *Williams* case, this Court had repeatedly held that the challenged circumstance is not vague or overbroad. *See State v. Melson*, 638 S.W.2d 342 (Tenn.1982); *State v. Pritchett*, 621 S.W.2d 127 (Tenn.1981); *State v. Strouth*, 620 S.W.2d 467 (Tenn. 1981); and *State v. Groseclose*, 615 S.W.2d 142 (Tenn.1981). In *Strouth*, we stated that this aggravating circumstance should be interpreted to refer to a conscienceless or pitiless act which was unnecessarily torturous or evinced a depraved state of mind; that the torture inflicted must be heinous, atrocious or cruel. The killing of Officer Moore meets this test. But even if it did not meet the test, the other aggravating circumstances found by the jury are more than sufficient to sustain the sentence imposed.

The defendant claims that the failure of the trial court to give the numerous requested instructions and the failure of the trial court to give *sua sponte* several pattern jury instructions usually given at guilt trials was basic error. We disagree. The instructions given the jury by the trial court were accurate and covered the areas included in the special requests. *See Edwards v. State*, 540 S.W.2d 641, 649 (Tenn. 1976). We would also point out that the instructions that the defendant insists should have been given by the trial court *sua sponte* were given in the guilt phase so that any possible error in their exclusion from the jury's instruction in the sentencing phase would be harmless. *See State v. Laney*, 654 S.W.2d 383, 388–389 (Tenn. 1983).

 Further, we find no error in the instruction of the trial court that the jury's verdict on punishment must be unanimous. It is in conformity with T.C.A. § 39–2–203(h), which expressly prohibits the trial judge and the attorneys from informing the jury in the effect of a failure of all jurors to agree on punishment, and is a correct statement of the law. *See State v. Buck*, 670 S.W.2d 600, 609 (Tenn.1984); *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn.1981).

 The defendant also argues that he was denied his right to a speedy trial, citing the fact that he was originally indicted in November, 1981, and was not tried until April 23, 1984. From these dates, without more, it would appear that there was an inordinate delay in trying the defendant. However, on hearing of the motion to dismiss, the trial judge found that the delay was substantially contributed to by the defendant. This finding is supported by the record. More than a year of the delay was the result of the defendant securing a dismissal of the indictment, forcing the State to appeal. Further, the record shows numerous motions filed by the defendant which required hearings, such as, the need for mental evaluations, and a change of venue. We find nothing in the record to indicate that any part of the delay was caused by the State's "conscious decision" not to bring defendant to trial within a reasonable period of time, as insisted by the defendant. Further, we find no prejudice to the defendant from any action by

**400**

the State. *Cf. State v. Bishop,* 493 S.W.2d 81, 83–85 (Tenn.1973).

In one pre-trial motion that required a hearing, the defendant challenged the venires from which the grand jury that returned the indictment in this case was chosen. It was defendant's theory that he was denied a fair-cross section of the community and denied due process because women were under-represented. He did not raise an equal protection challenge.

■ Defendant's proof on this issue showed that the general population of Hickman County was 49.9% female, 51% male and, according to his statistician's calculations, the population eligible to serve as jurors was 55% female, 45% male. The grand jury that indicted defendant in November 1981 was composed of ten males and three females; the August, 1983, grand jury of nine males and four females. Although the statistician testifying for the defendant felt that an absolute disparity of 10% or more was "important," the under-representation of women in the venire does not seem to us to be unfair or unreasonable under the proof in this case.

Nor does there seem to be any systematic exclusion of women from the jury selection process, a process the defendant also says is unconstitutional. The jury commissioners had followed, to the best of their ability, the court's express instruction to choose a wide spectrum of persons from the community regardless of race, religion, etc. Using the voter registration list during the period covered by defendant's challenge, the commissioners would choose 200 persons from each of the ten districts in Hickman County. The record does not support defendant's allegations that this process was "intuitive." The commissioners excluded the names of persons they knew were deceased, disabled or convicted of a criminal offense. There is no evidence even suggesting that they excluded women from the jury pool. Explaining the discrepancy in the number of women actually serving on the grand juries, the trial court stated that there were no automatic exclusions or exemptions granted women but that women would frequently offer compel-

ling reasons for excusal, namely the care of young children. In our opinion the proof does not support a finding of substantial under-representation of women as a result of their systematic exclusion in the grand jury selection process.

Further, the record does not support defendant's allegations that the sheriff, not the trial court, excused jurors. Neither is there any proof in the record concerning the allegation that no record of jurors was kept contrary to the requirements of T.C.A. § 22–2–302.

The defendant also raised a number of issues involving the *voir dire.* Defendant insists that six jurors were improperly excused for cause, and that motions to excuse four other jurors "for cause" were improperly denied. We have carefully considered the responses of the jurors during *voir dire,* and find no error in any of the trial court's rulings. The six jurors excused for cause made it clear that their views on the death penalty would substantially impair the performance of their duties as jurors in accord with the trial court's instructions and the law, which is what is required for a juror to be disqualified from service under *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The four prospective jurors that were not dismissed for cause indicated that they could follow the trial court's instructions as to punishment, mitigation and the insanity defense, thus making them qualified for service. *See Brazelton v. State,* 550 S.W.2d 7 (Tenn.Crim.App.1974).

The defendant further insists that the trial court unduly restricted the examination of prospective juror Cary Vielhauer for bias in favor of the death penalty. This criticism is not born out by the record. Juror Vielhauer had stated his views on the death penalty, and it became apparent he would not automatically vote for the death penalty. Examination then became repetitious, with the result that the trial judge terminated further examination on the issue. In our opinion the ruling of the trial court was proper in the exercise of his discretion to control *voir dire. See State*

*v. Jefferson,* 529 S.W.2d 674, 682 (Tenn. 1975).

The defendant also contends that the State improperly used its peremptory challenges to remove persons who were hesitant about imposing the death penalty, but were not excludable for cause under the guidelines set forth in *Wainwright.* We find nothing in the record to support this contention. In any event, to this point, the only limitation that has been placed on the State's or the defendant's traditional right to exercise their peremptory challenges in any manner they see fit is the use of the challenges "in a racially discriminatory manner."

Finally, the defendant makes a broad attack on the constitutionality of the Tennessee Death Penalty Act. While the issues raised are numerous, none are original and all have been previously considered by the Court and found to be without merit. *See State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.1986); *State v. Zagorski,* 701 S.W.2d 808 (Tenn.1985); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); *State v. Teague,* 680 S.W.2d 785 (Tenn.1984); *State v. Caruthers,* 676 S.W.2d 935 (Tenn.1984); *State v. Simon,* 635 S.W.2d 498 (Tenn.1982); *Houston v. State,* 593 S.W.2d 267 (Tenn. 1980).

After review mandated by T.C.A. § 39–2–205, and finding no prejudicial error in the record, the defendant's conviction of first degree murder and sentence of death are affirmed. The death sentence will be carried out as provided by law on the 25th day of July, 1989, unless stayed by appropriate authority. Costs are adjudged against defendant.

DROWOTA, C.J., and FONES, HARBISON, and O'BRIEN, JJ., concur.