IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MAY 1999 SESSION

FILED

August 31, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9802-CR-00076 |
| | ) | |
| vs. | ) | Hamilton County |
| | ) | |
| HARRISON PEARSON, | ) | Hon. Stephen M. Bevil, Judge |
| | ) | |
| Appellant. | ) | (Aggravated Arson) |

FOR THE APPELLANT:

**ARDENA J. GARTH**
District Public Defender

**KARLA G. GOTHARD (at trial)**
Assistant Public Defender
701 Cherry Street, Suite 300
Chattanooga, TN 37402-1910

**EDWARD T. LANDIS (at sentencing and**
Attorney at Law          **on appeal)**
744 McCallie Avenue, Suite 327
Chattanooga, TN 37403

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**ELLEN H. POLLACK**
Assistant Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN 37243-0493

**WILLIAM H. COX III**
District Attorney General

**JOHN W. MILLICAN and
DAVID W. DENNY**
Asst. District Attorneys General
600 Market Street, Suite 310
Chattanooga, TN 37402

OPINION FILED:_____

AFFIRMED

**JAMES CURWOOD WITT, JR., JUDGE**

<u>**OPINION**</u>

The defendant, Harrison Pearson, appeals from his jury conviction in the Hamilton County Criminal Court for aggravated arson, a Class A felony. See Tenn. Code Ann. § 39-14-303(a)(1) (1997). The trial court imposed a twenty-year sentence in the Tennessee Department of Correction. In this direct appeal, the defendant contends the state improperly withheld the existence of taped statements of witnesses and improperly rehabilitated one of its witnesses out of court. After a review of the record, the briefs of the parties, and the applicable law, we affirm.

Floyd Polk, the defendant's neighbor and friend, testified that on March 1, 1996, the defendant came to his home at 1117 Belmeade Avenue around 9:30 p.m. For approximately an hour, they drank whiskey and talked. Polk testified that the defendant was laughing and joking at this time. The defendant left Polk's home, but returned between midnight and 12:30 a.m. Polk testified that at this time the defendant smelled like gasoline and there was a gallon jug with a liquid appearing to be gasoline in Polk's yard. When Polk asked the defendant about the gasoline, the defendant said he had obtained the gasoline to help Tommy Ramsey's son whose car ran out of gas. As the defendant was leaving Polk's home, Polk saw the defendant walking toward 1005 Belmeade Avenue, where the fire occurred.

After cross examination, the state's attorney asked for a bench conference. During the bench conference, the state's attorney said Polk's testimony was inconsistent with his tape-recorded pretrial statement. The defendant's attorney informed the judge that she had not received a copy of any pretrial statements by testifying witnesses, including Polk's pretrial statement. The court ordered that the defense be provided with these pretrial statements, and a recess was allowed for the defendant's attorney to review the statements. After the recess, Polk testified that he reviewed the recording of his March 5, 1996 statement during

2

the recess at the district attorney's office. The defendant's attorney objected to the district attorney's allowing Polk to review his pretrial statement during the recess. The court overruled the objection and allowed Polk to testify.

Polk testified on further direct examination and cross-examination that he had forgotten to mention in his earlier testimony that the defendant was upset earlier that night about his pending divorce. The defendant seemed hurt by the divorce situation. Polk testified that he remembered the defendant's mood on the night of the fire after listening to his pretrial statement during the recess. Polk testified that the defendant was depressed when he arrived at Polk's home at 9:30 p.m., but after they talked, the defendant was "acting all right." Polk did not see the defendant set the fire that occurred at 1005 Belmeade Avenue.

Paulette Pearson and the defendant were in the process of a divorce, and the defendant had permanently moved out of their house at 1005 Belmeade Avenue two weeks prior to the fire. Paulette Pearson testified that the defendant arrived there at 5:00 p.m. on March 1, 1996. They talked about selling the house and splitting the proceeds or remodeling the house. The defendant left the house at some point and returned around 11:30 p.m. Pearson testified that the defendant was drunk at 11:30 p.m. The defendant wanted Pearson to drive him to his mother's house. When they arrived at his mother's house, the defendant refused to exit the car. Pearson testified that she had to forcibly remove the defendant from the car. When Pearson arrived home, the defendant was on the phone requesting to speak with her. She refused to talk to the defendant and went straight to bed at 11:40 p.m. She was awakened by Yolonda Pearson screaming that the house was on fire. Yolonda Pearson, Paula Mason and Denzel Mason were in the house with Paulette Pearson when the fire occurred sometime after 1 a.m.

There were two fires, one at the front door and one at the back door. As the fires blazed, Pearson heard someone knocking on the door and thought it was the defendant. She thought the defendant had started the fire because he had threatened to burn the house on numerous occasions; however, the person knocking on the door was a neighbor, who kicked the front door open so that the occupants of the house could run through the door. Pearson did not see the defendant set the fire, but she believed he did.

Yolonda Pearson, the daughter of Paulette Pearson and the defendant, testified that she discovered the fire. She thought the defendant was the person knocking on the door during the fire because he had been saying for years that he would burn the house. She testified that Eric and Tim Fossis, the defendant's step-sons, went to the defendant's mother's house after the fire to find the defendant because they believed the defendant started the fire. The Pearsons' dog that always stayed close to their house was not at their house during or after the fire; instead, the dog was at the defendant's mother's house. This fact confirmed their belief that the defendant started the fire.

Sheila Earvin testified that she saw the defendant walking toward the Conoco on Tunnel Boulevard with a plastic jug at 12:15 or 12:20 a.m. on March 2, 1996. The defendant had previously talked to her about his divorce, and he was upset. Earvin did not know if the defendant started the fire, but she did tell the detectives that she was angry with the defendant for burning the house.

Alec Conner, an investigator with the Chattanooga Police Department's arson division, was called to the scene of the fire on March 2, 1996. Conner noticed a splash pattern and an oily film on the front of the house. He collected samples of fire debris for testing. As he was collecting the samples, he

4

smelled a distinct accelerant odor. Sample three, pink insulation at the base of the wall inside the back of the house, smelled strongly of gasoline. Conner testified that the irregular burn patterns were caused by a liquid accelerant. Paulette Pearson told Conner that the defendant had threatened to burn the house. Conner asked an officer to bring the defendant to the Fire Administration Building to talk to him.

When the defendant arrived, Conner advised him of his rights. Conner detected a strong odor of alcohol, and the defendant's hands smelled strongly of bleach. Conner terminated the interview because he believed the defendant was intoxicated. The Monday after the fire, Conner talked to several neighbors near the fire. Conner concluded that the defendant was a suspect, and the defendant was arrested on March 7, 1996. On this date, the defendant signed a waiver of rights form. The defendant wrote two statements after waiving his rights, one at Conner's office and one at the county jail. The defendant denied involvement in the fire in both statements.

Conner identified his report on the fire. An unidentified person in the crowd surrounding the house after the fire told Conner that a black male, who was five feet nine inches tall, weighing 160 pounds, wearing dark clothes, was seen running from the fire. This information was written in the suspect section of Conner's report. The defendant's name was not listed in the suspect section of this report.

Betty Watkins, a Century 21 agent, testified that the defendant called her to perform a market analysis on the house at 1005 Belmeade Avenue. She testified that she and the defendant scheduled an appointment for March 8, 1996 so that she could list the house. The defendant scheduled the appointment at least one week in advance.

5

The defendant testified that he was not involved in setting the fire at 1005 Belmeade Avenue. Although the divorce settlement stated that the house would be sold and the proceeds split evenly, the defendant acquired estimates for remodeling the house because Paulette Pearson wanted to keep the house. On March 1, 1996, the defendant went to Tommy Ramsey's house around 4:30 p.m. where he helped Ramsey paint a box surrounding a flower bed. At some point, the defendant saw a suspicious white male in a maroon truck sitting at the corner of the fence near 1005 Belmeade Avenue. The defendant was concerned that there was drug activity in which his step-sons were involved with the man in the truck. The defendant went to Floyd Polk's house around 9:30 p.m. and left there around 11:00 p.m. At this time, the defendant walked to 1005 Belmeade Avenue and asked Paulette Pearson to drive him to his mother's house. She drove him to his mother's house, and he exited the car.

At his mother's house, the defendant realized he had paint on his hands. He asked his mother for 50 cents to buy gasoline to wash the paint off his hands. On his way to the Conoco station, the defendant encountered a man who was having trouble starting his car because the man thought he was out of gas. The defendant offered to help, and he bought gas at the Conoco station. The defendant helped the man start his car, and then walked to Polk's house. He stayed at Polk's house for ten to fifteen minutes, then he walked to his mother's house where he changed clothes and fell asleep. The defendant was awakened by someone saying his house was on fire. When he awoke, he was bleeding because, as he was told, Tim Fossis and others had knocked him unconscious and beat him. The police arrived soon thereafter, and he changed into his work clothes. His work clothes were not clean and his rubber boots were "contaminated" with chlorine from his job at Olin Chemical. He made a short statement to the police, and they released him. The defendant denied any drug use, but admitted he had

6

been drinking alcohol since he was seven years old. The defendant testified that he received medical treatment for the beating he received the night of the fire.

After hearing all the evidence, the jury convicted the defendant of aggravated arson.[1]

## I. Pretrial Statements

The defendant contends the State improperly withheld the existence of taped statements of witnesses. As described above, the defendant was not provided with the pretrial taped statements of certain witnesses until the cross-examination of the first of these witnesses, Floyd Polk. The state's attorney said the defendant had not requested these statements prior to that point in time. The defendant's attorney said she had requested all pretrial statements of witnesses. The court ordered the state's attorney to provide a copy of the pretrial statements to the defendant's attorney immediately, and a recess was called in order for the defendant's attorney to review these statements.

The defendant is claiming the state's attorney should have disclosed the existence of these pretrial statements to the defense. However, there is no claim that any of these statements were favorable to the defense such that the state's attorney would be required as a constitutional matter to disclose their existence with or without a request from the defendant. See Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 1565 (1995) ("*Bagley* held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the

_____

[1] The defendant was indicted on four counts of attempted first degree murder in addition to the indictment for aggravated arson. The jury found the defendant not guilty on the four counts of attempted first degree murder.

evidence been disclosed to the defense, the result of the proceeding would have been different.'") (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)). Furthermore, Tennessee Rule of Criminal Procedure 16(a)(2) provides that the defendant in a criminal case is not entitled to pretrial discovery of "statements made by state witnesses or prospective state witnesses." Accordingly, the state's attorney was neither required to disclose the existence of the witnesses' pretrial statements nor to disclose the contents thereof.

Rule 26.2(a) provides that "[a]fter a witness other than the defendant has testified on direct examination, the trial court, *on motion of a party who did not call the witness*, shall order the attorney [for the side sponsoring the *witness*] to produce . . . any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified." Tenn. R. Crim. P. 26.2(a) (emphasis added). Based upon our review of the record, there was no motion by the defendant for Polk's statements until the state raised the issue after cross-examination. Under Rule 26.2(a), the state's attorney was not required to provide a copy of the statement to the defendant until a motion was made by the defendant *after* the witnesses testified on direct examination. See State v. Taylor, 771 S.W.2d 387, 394 (Tenn. 1989). Once the existence of the pretrial statements came to light, the defendant was provided a copy and an opportunity, via a recess, to review the statements. See Tenn. R. Crim. P. 26.2(d).

There was no improper withholding of the pretrial statements of the witness.

## II. Improper Rehabilitation of Witness

Next, the defendant contests the State's rehabilitation of one of its witnesses, Floyd Polk, out of court during a recess. The defendant contends his

8

right to confront the witness was violated by this out of court rehabilitation, and that the testimony after rehabilitation was very damaging to the defendant.

At the end of Polk's cross-examination, the prosecutor asked for a bench conference where he informed the judge and the defendant's attorney that Polk's testimony was inconsistent with his pretrial statement. The prosecutor attempted to have Polk declared a hostile witness, but the court declined. Instead, the court said the prosecutor would be allowed to ask Polk about his pretrial statement. After Polk listened to his pretrial statement during the recess, the prosecutor attempted to lay a foundation for Polk's need to refresh his memory.

Floyd Polk was extensively questioned on cross-examination about his listening to his pretrial statement during the recess. He never claimed on the witness stand to have forgotten the events of March 1-2, 1996. However, Polk testified on redirect examination that his memory was refreshed by listening to his pretrial taped statement. Polk testified on cross examination that the prosecutor did not tell Polk to testify differently or change his testimony in any way. According to Polk, the prosecutor only asked that he listen to his pretrial taped statement during the recess.

First, we will analyze the procedure form as a claim of trial court error. Then we will review it as a claim of prosecutorial misconduct.

(a)

The prosecutor attempted to refresh Polk's memory by allowing him to listen to his pretrial statement during the recess. For a writing to be used to refresh the memory of a witness, the witness must claim a lack of memory of the events in question. See Tenn. R. Evid. 612, advisory comm'n comments. Whether

9

Rule 612 extends to taped statements used to refresh a witness' memory while testifying need not be decided in this case. Cf. Neil P. Cohen, Sarah Y. Sheppeard and Donald F. Paine, *Tennessee Law of Evidence* § 612.2, at 402 (3d ed. 1995) ("Rule 612 provides no guidance for things other than writings . . . If a witness refreshes recollection by listening to a tape recording of a conversation, Rule 612 does not apply"). Regardless of Rule 612's application to a taped statement, a proper foundation was not laid for Polk's listening to his pretrial taped statement in order to refresh his memory. The witness claiming a lack of memory is the foundation required for a writing to be used to refresh the witness' memory. Polk neither claimed a lack of memory prior to listening to his pretrial statement nor was his memory refreshed on the witness stand. But see State v. Mathis, 969 S.W.2d 418, 421 (Tenn. Crim. App. 1997) (foundation required under Rule 612 was shown where witness testified that his memory was refreshed *after* he was shown and read a prior statement on the witness stand).

The prosecutor's process of examining Polk can be viewed as an attempt to impeach the credibility of his own witness. See Tenn. R. Evid. 607; State v. Randy Lee Jones, No. 01C01-9708-CC-00326, slip op. at 19 (Tenn. Crim. App., Nashville, July 8, 1999) (prior inconsistent statement may be used to impeach a party's own witness). The prosecutor could have impeached Polk by asking him about his prior inconsistent statement while Polk was testifying. See Tenn. R. Evid. 607, 613.[2] Under those circumstances, the prior statement would not be substantive evidence. It would be admissible only for impeachment purposes. See

_____

[2]The state inaptly requested a declaration that Polk was a hostile witness. This is an artifice designed to allow a party calling a witness to ask the witness leading questions. See Tenn. R. Evid. 611(c). A declaration of hostility is not a condition precedent to Rule 613 impeachment of a party's own witness via a prior inconsistent statement.

10

State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982).[3]

It is evident from the record that the prosecutor intended that Polk's prior statement regarding the defendant's state of mind on the night of the fire be substantive evidence. After listening to his prior statement, Polk changed his testimony to coincide with the prior statement. Because Polk changed his testimony, the substance of the prior statement about the defendant's state of mind on the night of the fire became evidence via the direct testimony. See Neil P. Cohen, Sarah Y. Sheppeard and Donald F. Paine, *Tennessee Law of Evidence* § 613.1, at 407 (3d ed. 1995) ("the in-court testimony becomes the real evidence"). Thus, as long as the prosecutor was proceeding in good faith, he could have broached the subject of the pretrial statement through Rules 607 and 613, and once the witness adopted the content of the pretrial statement, the resulting testimony would be substantive evidence.

Although the procedure used by the prosecutor in examining Polk is not proper under the rules of evidence, any trial court error in allowing the redirect testimony after Polk listened to his pretrial statement was harmless. Tenn. R. Crim. P. 52(a). Had the prosecutor followed proper impeachment procedures, the evidence would have been substantively admissible.

(b)

The prosecutor did not follow the proper procedures in examining Polk, but his conduct does not rise to the level of prosecutorial misconduct. To

---

[3]A prior statement may be introduced as substantive evidence under the hearsay exception of Rule 803(5). See Tenn. R. Evid. 803(5). However, the state did not seek to introduce Polk's prior taped statement into evidence. Additionally, Polk did not testify that he had "insufficient recollection to enable [him] to testify fully and accurately." Tenn. R. Evid. 803(5). Therefore, Rule 803(5) is inapplicable to this case.

establish a claim for prosecutorial misconduct, the defendant must prove that the "improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). To determine whether prosecutorial misconduct affected the verdict to the prejudice of the defendant, five factors should be considered. The five factors to be considered are:

> (1) [t]he conduct complained of viewed in context and in light of the facts and circumstances of the case,
>
> (2) [t]he curative measures undertaken by the court and the prosecution,
>
> (3) [t]he intent of the prosecutor . . .,
>
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record, [and]
>
> (5) [t]he relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Considering the five factors, we find the prosecutor's conduct was not improper, particularly in light of factors (1) and (5). It did not affect the verdict to the prejudice of the defendant. Under factor (3), the prosecutor appears to have acted out of confusion in "the heat of battle," not in a manner calculated to unfairly prejudice the defendant. Under factor (4), we note again that Polk's testimony would have been admissible if the prosecutor had used the proper methods for examining him.

Finding no error in the trial court, the judgment is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:


_____
JOHN EVERETT WILLIAMS, JUDGE


_____
ALAN E. GLENN, JUDGE


13