**William HICKS, Plaintiff in Error,**

**v.**

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Feb. 9, 1972.

Certiorari Denied by Supreme Court
May 1, 1972.

Fred M. Milligan, Chattanooga, for plaintiff in error.

David M. Pack, Atty. Gen., Alex B. Shipley, Jr., Asst. Atty. Gen., Nashville, Stanley J. Lanzo and Lawrence Young, Asst. Dist. Attys. Gen., Chattanooga, for defendant in error.

## OPINION

GALBREATH, Judge.

Plaintiff in error appeals from his conviction of robbery in the Criminal Court of Hamilton County and assigns as the only error by which he seeks reversal of the five to ten year sentence imposed the introduction into evidence against him of the contents of a letter admittedly written by him while in jail. The letter, recovered from a trustee by a jail guard before it was delivered to the intended recipient, was addressed to a girl friend of the defendant, also an inmate in the jail, and read as follows:

"Hello Darling. How are you this day. Honey, what's wrong I have sent you four letters and I have not got a letter from you. I even give the matron a letter to give you. Did you get it? It was the one I was telling you what I wanted you to do and tell my lawyer when he come to talk with you. Bit I am going to try to come with him when he do. But if I can't come you tell him that we was together on the night of December the 1st, and we was together until I left that Tuesday morning around 5:15 or 5:20, going to work, and if he asks you how long have you known me tell him since 1965. So let me know. Will you do that because I am going over on the 29th, and if I beat this and get out I will get you out if it is any way for you to get out. So if you help me I will help you. OK. So come down Tuesday to see the doctor and bring me a letter. Oh yes, did you get the money? From Hicks to my Baby. Write soon."

There was ample evidence before the jury at the time the letter was read by the defendant to them over objection as to its admissibility upon being requested to do so by the assistant district attorney general during cross examination that the defendant had assaulted and robbed the victim in the wash room of the Greyhound Bus Terminal at about 5 A.M. on the 2nd day of December. It is readily apparent that if the facts regarding the defendant and his girl friend's association until after that time could be established, a perfect defense of alibi would be available to him. It was the State's purpose to show that the defendant was attempting to manufacture such a defense as conduct inconsistent with innocence.

Although all of the error alleged resulted from the introduction of the letter, the plaintiff in error urges upon us four separate reasons for holding that its admission requires reversal:

(1) The contents of said letter were such that it could easily have been misunderstood by the jury much to the detriment of the defendant's rights to a fair trial;

(2) The evidence was illegally obtained in violation of the Constitutions of the State of Tennessee and the United States;

(3) The defendant was compelled to give evidence against himself in violation

of the constitutions of the State of Tennessee and the United States; and

(4) The language of said letter was such that it could have been interpreted by the jury as a confession of guilt. It was obtained without advising defendant that it might be used against him.

Whether or not the letter was intended to instruct the defendant's lady friend to commit perjury or tell the truth raised a question of fact for the determination of the jury, taking into consideration all the other evidence in the case. The defendant carefully explained his position that the letter was intended only to "remind" the potential witness and not to prompt her to lie. The jury, in view of the absence of any alibi witnesses and the convincing proof that the defendant was the man who robbed the victim (whose watch and billfold were recovered from Hicks), was certainly within its prerogative in finding this issue against him. See McBee v. State, 213 Tenn. 15, 372 S.W.2d 173.

The letter came into the hands of the jail authorities through means that did not trench upon any rights of the defendant. He voluntarily wrote the letter; and no coercion, trickery or deceit was involved on behalf of State agents in acquiring it. Such communications are not unlike spontaneous utterances that may be overheard by a third party and used in the prosecution of the person making them. If the incarcerated girl friend of the defendant had been in an adjoining cell making oral communication possible but subject to being overheard by a guard, it is doubtful if the defendant would even contend that material statements thus broadcast would be inadmissible. Even if such statements made vocally were addressed to none in particular, as a cry of anguish such as, "Woe is me. I have killed my dearest love!" might emanate from the depths of a lonely dungeon and soul, no reason suggests itself why such statements against interest would not be admitted on trial. Far from being inadmissible for reasons spelled out in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, as urged by the plaintiff in error, the opinion in that landmark case approves the use of such admissions against interest:

Volunteered statements of *any kind* are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 86 S.Ct. at 1630.

The fact that words are written rather than vocalized should not diminish their acceptability as probative material but should actually enhance it. Thus, a note penned by a would be suicide, or the contents of a diary, wholly in the handwriting of the declarant, should be the highest evidence of what was said by the writer on the subject if admissible as having been obtained in a manner not violative of the constitutional immunities of the defendant. Since the guard in this case had the unquestioned authority to intercept messages being passed from one part of the jail to the other, it cannot be said that the writing was unlawfully wrested from the defendant. As was held by the United States Supreme Court in a case directly in point:

"Certain letters were offered in evidence at the trial containing expressions tending to establish the guilt of the accused. These letters were written by him after the homicide and while he was an inmate of the penitentiary at Leavenworth. They were voluntarily written, and under the practice and discipline of the prison were turned over ultimately to the warden, who furnished them to the district attorney. It appears that at the former trial, as well as the one which resulted in the conviction now under consideration, application was made for a return of these letters upon the ground that their seizure and use brought them within principles laid down in Weeks v. United States, 232 U.S. 383, 34 Sup.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177, and kindred cases. But we are unable to discover any application of the principles laid down in

those cases to the facts now before us. In this instance the letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process. They came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution. Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure, in violation of his constitutional rights."

Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103.

Regardless of how the message got into the hands of the trustee from whom the guard recovered it, there can be no doubt that jail authorites have a legitimate interest in preventing messages being surreptitiously sent from one part of the prison to another. Censorship of all mail going in and out of a prison to and from inmates, with the exception of certain privileged communications to and from attorneys and the like, is universally recognized as a necessary means of inhibiting escapes, revolts, traffic in contraband and other undesirable and illegal activity frequently the concern of prison officials and society itself. While there is a growing movement to allow freer exchanges of private correspondence between prisoners and their families and friends, nowhere yet have we encountered a suggestion that prisoners in such institutions be allowed to communicate without supervision with other prisoners. There was, as aforesaid, no deprivation of any known right of the defendant in the guard's obtaining the letter from another prisoner and delivering it to prosecuting authorities.

■ We find equally unmeritorious the plaintiff in error's theory that his rights against self incrimination were violated when he was requested to read the letter to the jury during cross examination. In the first place, the constitutional right afforded by both State and Federal Constitutions is a right which, like others, may be waived. By voluntarily electing to become a witness and offer testimony in the cause the defendant effectively waived this right not to be a witness against himself:

" . . . [W]hen a defendant in a criminal case takes the stand in his own behalf, he waives his right to protection against compulsory inculpation, and a refusal to answer any question pertinent to that investigation is ground for adverse inference. 1 *Greenl. Ev. (15th Ed.) p. 600, note g, and case cited.*"

Clapp v. State, 94 Tenn. 186, 30 S.W. 214.

Of course, such interrogation must concern some proper subject matter for inquiry; and since we have held that the contents of the letter were of probative moment in the investigation it matters not whether the letter itself was introduced for the jury to read, or if it was read to them by counsel, or by the defendant. The objection entered in the record was to the admissibility of the letter itself, not to the request made to and accepted by the defendant without complaint that he himself read the words he had admittedly written. To our view he wisely chose to read the letter himself and then explain what he meant by it, rather than force the attorney general to read it and incur the inference the jury might legitimately draw from his obstinate attempt to keep from their knowledge that which the trial judge had already ruled was proper for them to consider.

Having rather thoroughly examined the assignment of error presented by the appellant and finding the issue raised adversely to him, we affirm the judgment.

RUSSELL, J., concurs.

OLIVER, J., concurs in result.