IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2003 Session

## STATE OF TENNESSEE v. BRANDON RAY ROLAND

**Direct Appeal from the Circuit Court for Rhea County**
**No. 15293     J. Curtis Smith, Judge**

---

**No. E2002-00927-CCA-R3-CD**
**August 21, 2003**

---

Following a jury trial, Defendant, Brandon Ray Roland, was convicted of first degree premeditated murder, first degree felony murder and theft of property over $10,000. The trial court merged the felony murder conviction into the premeditated first degree murder conviction and sentenced Defendant to life imprisonment. After a sentencing hearing, the trial court sentenced Defendant to three years for the theft conviction and ordered the sentence to run concurrently with the life sentence. In his appeal, Defendant argues that (1) the evidence is insufficient to sustain his conviction for first degree murder; (2) the trial court erred in not granting a new trial because of improper juror conduct; (3) the trial court erred in not suppressing a letter written by Defendant while in juvenile detention; and (4) the Rhea County Juvenile Court erred in transferring Defendant to stand trial as an adult. Defendant does not appeal his conviction for theft. Following a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Philip A. Condra, District Public Defender, and B. Jeffrey Harmon, Assistant Public Defender, for the appellant, Brandon Ray Roland.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; James Michael Taylor, District Attorney General; and James Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**a. Background**

The sequence of events leading up to Defendant's convictions began with his suspension from high school for carrying cigarettes in his backpack. At that time, Defendant was living with his father, Thomas Roland, the victim. When Mr. Roland reacted angrily to the news on Monday, Defendant lied and told his father that the school had rescinded the suspension. On Tuesday morning, Defendant boarded the school bus as usual. When he reached the school, however, he left the premises and went to Matt Crawford's house. Mr. Crawford had skipped school that day to "hang out" with Defendant. When Defendant did not come home on the school bus, Defendant's father called the Crawford home looking for him. Mr. Roland told Defendant he "was going to get" him and ordered Defendant to return home. At that point, Defendant and Mr. Crawford decided to run away to Florida, although Defendant was not sure where Florida was located. Defendant and Mr. Crawford walked to Defendant's home, a trip that took approximately three hours. During their long walk, the two discussed shooting Mr. Roland. After Mr. Roland was dead, Defendant and Mr. Crawford planned to steal his truck and credit cards so they could travel to Florida.

Mr. Roland was not at home when the young men arrived, but his Buick was parked in the driveway. Defendant decided to try to leave before Mr. Roland returned so Mr. Crawford attempted to break the car's lock with a knife. When these efforts failed, Defendant and Mr. Crawford retreated to their initial plan to kill Mr. Roland.

Defendant knew that Mr. Roland would come to Defendant's bedroom to check on him when he returned home. Defendant retrieved Mr. Roland's Browning hunting rifle from beneath his father's bed and loaded it. In the process, the gun fired and damaged a 12-gauge shotgun that Defendant had also laid on the bed. Defendant left the 12-gauge shotgun in Mr. Roland's bedroom and carried the Browning rifle and a second loaded shotgun into his bedroom. While Defendant was loading the rifles, Mr. Crawford stole Mr. Roland's knife collection and some jewelry that the young men could pawn for cash on the trip to Florida.

Defendant and Mr. Crawford went to Defendant's bedroom to wait for Mr. Roland but fell asleep some time during the night. Early the next morning, Mr. Roland woke the young men when he pounded on Defendant's bedroom window and yelled at Defendant to unlock the front door. Defendant removed the chain from the door and then returned to his bedroom, leaving his bedroom door open six to eight inches so he could watch his father's progress down the hallway. Defendant sat on the edge of his bed with the rifle in his arms. Mr. Roland kicked off his tennis shoes when he came inside the house and then started down the hallway towards Defendant's bedroom. As Mr. Roland started to enter Defendant's bedroom, Defendant aimed the rifle at his father, closed his eyes and pulled the trigger.

The bullet struck Mr. Roland in the chest. Mr. Roland fell to one knee, then stood up and stumbled out the front door where he collapsed on the porch. Defendant and Mr. Crawford each grabbed an arm and dragged Mr. Roland back inside the house. Defendant covered his father with a sheet and then tried unsuccessfully to wash the blood off the floor and door with bleach. Defendant showered and packed some clothes in a bag along with some ammunition. As Mr. Crawford waited for him on the porch, Defendant took his bag and the rifles to Mr. Roland's truck,

then returned to the house. He locked the front door behind him then climbed out of his bedroom window. The young men left in Mr. Roland's truck with Defendant driving. Mr. Roland's wallet was in the truck's glove compartment, and Mr. Crawford removed $120 and put the credit cards and wallet back in the compartment.

The young men first stopped for gas and soft drinks which they paid for with Mr. Roland's cash. They continued on but Mr. Crawford broke the rear view mirror when he tried to remove a necklace that was tied around it. Defendant stopped at another gas station near the high school and bought super glue. As they finally headed out of town, Mr. Crawford spotted Neal Nichols, the high school's security officer, who was parked in a patrol car monitoring the traffic near the high school. Mr. Crawford told Defendant to ask Mr. Nichols if he had a Florida map, but Defendant did not think that was a good idea. Instead, he pulled in beside the patrol car and asked Mr. Nichols if he had seen his father. Mr. Nichols got out of his vehicle and noticed the guns laying on the floorboard behind the truck's front seat. Mr. Nichols ordered the boys out of the car because he knew Defendant did not have a driver's license. As he searched the young men, Mr. Nichols found an expended bullet in Mr. Crawford's pocket and a gold ring with diamonds. Defendant was wearing two knives in his belt, and a third knife was on the floorboard on the passenger side of the truck. Mr. Nichols called for backup assistance, and Defendant and Mr. Crawford were taken to juvenile detention for questioning.

David Emiren, an agent with the Tennessee Bureau of Investigation, assisted the Rhea County Police Department with the investigation of Mr. Roland's death. Mr. Emiren read Defendant his rights and asked if he wanted his guardian to be present, but Defendant said that he did not want his mother called. During the two-hour interview, Defendant confessed to his role in his father's killing.

While in juvenile detention, Defendant asked permission to write a letter to his girlfriend. David McEntire, a police office at the Rhea County Juvenile Detention Center, provided Defendant with some paper and a pencil and told him to return the letter in an unsealed envelope when he was through. In his letter, Defendant essentially wrote the same description of the events leading up to his father's death as contained in his confession. After Mr. McEntire read the letter, he handed it over to the appropriate police representatives.

## b. The Trial

Joyce Rothwell, a long-time friend of Mr. Roland, said that Defendant came to live with his father at the end of 1997. Until then, Defendant had resided with his mother in McMinnville. Ms. Rothwell occasionally saw Defendant when his father brought him over to her house, but Ms. Rothwell had never seen Defendant mistreated by his father. Mr. Roland told her about the school suspension on Monday night when he and Defendant arrived for dinner. Ms. Rothwell heard Defendant tell his father that the school had changed its mind about the suspension. On Tuesday, however, Mr. Roland called Ms. Rothwell seven or eight times looking for Defendant because

Defendant had not come home on the schoolbus. Mr. Roland called later that night and said he had located and talked to Defendant over the telephone.

Tim Reed, a police officer with the Dayton police department, said that he received a call on Tuesday from Kim Crawford, Matt Crawford's mother, concerning a 12-gauge shotgun which she believed belonged to Mr. Roland that she had found at her house. Officer Reed took the gun over to the Roland home around 11:15 p.m. that night. Although a light was on in the living room, no one answered his knock. Officer Reed returned to the police department with the gun and handed it over to Officer Chris Sneed for follow-up the next morning.

Jeff Clark lived across the street from Mr. Roland. His daughter woke him around 7:10 a.m. on Wednesday morning. When he looked out the window, Mr. Clark saw a boy sitting on the front steps of the porch. He watched as Defendant crawled out of his bedroom window and joined the boy on the porch. The two young men got in Mr. Roland's truck and Defendant drove off. Mr. Clark went over to the Roland home to ask Mr. Roland about some tires, but Mr. Roland did not answer his knocks. Mr. Clark was going around the house to look in one of the windows when Officer Sneed drove up.

Officer Sneed testified that he tried to call Mr. Roland about the gun on Wednesday morning. When no one answered the telephone, Officer Sneed drove out to the house around 7:30 a.m. Mr. Clark met him in the front yard and told Officer Sneed that Mr. Roland was probably asleep because he worked the night shift. Mr. Clark also told Officer Sneed that Defendant had left the house earlier, driving his father's truck, but Mr. Clark did not think that Defendant had a driver's license. Officer Sneed returned to the police department where he contacted Mr. Nichols about Defendant's driving. Defendant, however, had already been apprehended by Mr. Nichols. After he learned about the information Mr. Nichols had gathered after detaining Defendant and Mr. Crawford, Officer Sneed returned to the Roland home accompanied by officers Thomas Solomon and Bill Cranfield.

When the officers approached the house, they noticed that the front porch was wet and smelled of bleach. The porch was splattered with blood with the largest smear by the front door. Because the front door was locked, Officer Solomon gained entry to the house through Defendant's bedroom window. He spotted Mr. Roland's body and unlocked the front door. Officer Solomon testified that there was blood splatter on the wall and front door, but the biggest blood stain was located at the foot of Defendant's bed.

Mr. Nichols testified that he found two guns in Defendant's truck, a .410-gauge shotgun and a lever action rifle equipped with a scope. The guns' barrels were pointing toward the driver's seat. Mr. Nichols did not find any money or jewelry on Defendant.

Rita Speers processed the young men when they were brought to the juvenile detention center. Ms. Speers found two knives, a gold ring with diamonds, a blank check with Mr. Roland's account number and $114.54 in cash in Mr. Crawford's possession. Defendant only had one dollar

in his pocket. Ms. Speers also said that Defendant told all the new arrivals at the center that day that he had killed his father.

Mr. Emiren testified that he located an expended .308 caliber bullet shell by Defendant's bed. There were no defense marks evident on Mr. Roland's body and no weapon in the vicinity of the body. Mr. Roland's checkbook was laying on the sofa. In the kitchen, Mr. Emiren discovered a piece of rope stained by blood, a bloody rag and a black handled knife with a bent blade. In Mr. Roland's room, Mr. Emiren located a Remington 1100 shotgun that had been damaged when hit by a bullet from another gun and a Winchester .22 rifle and muzzle loader in a case beneath the bed. Although the knife collection by the headboard had not been disturbed, Mr. Emiren found empty knife boxes on the dresser. Drops of blood were located by the commode and in the bathtub. An examination of Mr. Roland's car revealed that the steering column had been damaged.

Mr. Emiren admitted that he did not try to contact Defendant's mother before questioning him even though he knew Defendant was a minor. Defendant appeared very calm during the interview although Mr. Emiren detected some anger at times by the tone in Defendant's voice. Mr. Emiren said that he did not follow up on Defendant's allegations of abuse against Mr. Roland.

Charles Harlan, the state's chief medical examiner, performed Mr. Roland's autopsy. The bullet was shot from more than two feet away and penetrated both lungs, the aorta and the pulmonary artery before lodging in Mr. Roland's right arm. Although Mr. Roland could not have survived the gunshot wound, he was conscious for a few minutes, and his motor functions had not been damaged. Mr. Roland tested negative for alcohol, but blood samples showed traces of Trazodone, an anti-depressant, diphenhydramine, an antihistimine, and ephedrine or pseudoephedrine, an ingredient found in cold remedies. Although the blood samples showed a possibility of the presence of diazepam or Valium, Dr. Harlan did not order further tests to determine if these drugs actually were present in Mr. Roland at the time of his death.

Steve Scott, an agent for the Tennessee Bureau of Investigation, performed the ballistics tests on the Browning rifle. Although he could not specifically conclude that the expended bullet found by Defendant's bed came from the rifle, the bullet was consistent with the rifle's .308 caliber. Mr. Scott also noted that the bullet was a jacketed soft point bullet which leaves a larger wound on impact.

The defense began with Defendant's own testimony. Defendant said that he initially wanted to live with his father because he and his mother were having disagreements and he wanted to have a relationship with his father. However, his father often hit Defendant hard enough with his fists to leave bruises. One time, Mr. Roland burned Defendant with a cigar and on another occasion shot Defendant in the back with a BB gun. Mr. Roland told Defendant he would kill him if Defendant ever stood up to him and constantly berated Defendant with vulgar names. Defendant had been prescribed Zoloft and Clonodine after a hospitalization for mental problems, but Mr. Roland took his son's medications away, telling Defendant that he would have to learn how to deal with problems. When Defendant was prescribed pain medication after a visit to the dentist, Mr. Roland

took the medicine himself. On cross-examination, Defendant said that he had never told anyone about the abuse and admitted that it was his mother's idea for Defendant to live with his father because she found it difficult to handle Defendant.

Defendant denied that the killing was done in order to take Mr. Roland's personal effects. After talking to Mr. Roland Tuesday evening, Defendant walked home because Mr. Roland said it would be worse for him if Defendant stayed away. Both young men believed that Mr. Roland would beat Defendant when he got home that Tuesday night because of Defendant's lies about the suspension.

Two weeks earlier, Mr. Crawford had seen Mr. Roland strike Defendant in the chest with his fists. Afterwards, Mr. Crawford and Defendant went to Defendant's bedroom, and Mr. Crawford told Defendant he ought to kill his father. Later, as Defendant and Mr. Crawford walked to Defendant's house that Tuesday evening, Mr. Crawford brought up the idea of killing Mr. Roland again. Defendant said he just wanted to leave before his father got home Tuesday night. It was only when Mr. Crawford could not start the car that Defendant retrieved the guns.

Defendant was convinced his father was going to hurt him when he unlocked the door on Wednesday morning, and he only held the gun to forestall his father's attack. Defendant said that his father burst into his bedroom and scared him. Defendant closed his eyes and pulled the trigger. Afterwards, Defendant decided that he did not want to go to Florida and stopped by Mr. Nichols' patrol car hoping that he would get caught.

Defendant's mother, Frankie Robertson, confirmed that Mr. Roland often hit Defendant, and that she, too, had been abused by Mr. Roland when she was married to him. On one occasion, she reported Mr. Roland's abuse to the Department of Human Services, but nothing came of the investigation although Defendant and his sister, Bridget, were interviewed by the department. When Defendant attempted to commit suicide, Mr. Roland was furious and threatened to beat him. Mr. Roland stopped Defendant's medication although Defendant was calmer, more balanced, when he was taking his medicine. During his Christmas visit with his mother shortly before the killing, Defendant said that he could not live with his father anymore. Ms. Robertson, however, thought that Mr. Roland might change and refused to let Defendant move back to McMinnville. On the night before his death, Mr. Roland called Ms. Robertson and said that he was furious about Defendant's suspension from school. Mr. Roland admitted at that time that he had beaten Defendant although Ms. Robertson had been told Defendant's bruises were acquired at school. Ms. Robertson admitted that she had not talked to Defendant since the Christmas before the incident.

Ms. Robertson characterized her son as immature and a follower rather than a leader. Defendant still requested that she buy him children's play cards and played peek-a-boo with her through the narrow window in his cell, sometimes for as long as twenty minutes.

Both Bridget Roland, Defendant's sister, and Cheryl Roberts, Mr. Roland's girlfriend, confirmed that Mr. Roland physically and verbally abused Defendant. Ms. Roberts described Mr. Roland as "very controlling," and said that she, too, had been struck by Mr. Roland on occasion.

The defense offered the testimony of Dr. Peter Brown, a psychiatrist, in support of its contention that the defendant was suffering from diminished capacity as a result of a mental disease. Dr. Brown reviewed Defendant's medical records and the results of an intelligence and personality evaluation performed after the killing by Dr. Thomas Pendergrass. Dr. Brown also personally conducted a psychiatric interview with Defendant and a mental status examination. Dr. Brown said that the data evidenced a history of physical and verbal abuse which had resulted in a serious psychiatric disorder requiring treatment. Based on his review of the available information, Dr. Brown concluded that Defendant suffered from a chronic depression with prior episodes of major depression. Dr. Brown characterized chronic depression as lasting more than six months while a major depressive episode has a clear beginning, middle and end. In addition to feelings of hopelessness, low self-esteem, and a tendency to overreact to perceived threats, Dr. Brown stated that Defendant's mental condition adversely impacted his ability to plan and make decisions. Dr. Brown defined "diminished capacity" as an impaired ability to make a decision, devise a plan to effectuate the decision and then adequately carry out the plan. Dr. Brown said that Defendant had attempted to avoid Mr. Roland's abuse by trying to commit suicide and by running away from home. Dr. Brown's opinion was that Defendant believed killing his father was the only remaining option. Two other factors contributed to Defendant's diminished capacity to make decisions and plan. First, Defendant had not been consistently medicated for his psychiatric disorders since diagnosis. Secondly, although seventeen at the time of the crime, Defendant's emotional age was closer to a boy of twelve to fourteen years which further impaired his ability to formulate a plan and successfully carry it out.

On cross-examination, Dr. Brown stated that Defendant had the capacity to understand and appreciate the nature of his conduct. Dr. Brown further agreed that Defendant did not completely lack the capacity to formulate a decision and a plan, only that his capacity was not what would be expected of someone who did not suffer from Defendant's psychiatric disorders. Instead, Defendant's planning and decision making skills were more consistent with those associated with a twelve-year-old than someone of Defendant's own age. Although recent intelligence tests assigned Defendant an IQ of 74, Dr. Brown agreed that Defendant has previously exhibited an IQ of 85. Dr. Brown explained, however, that people suffering from a chronic depression fluctuate in their ability to perform well on the test. Dr. Brown also agreed that Defendant's prior medical records characterized him as a "defiant and resistant adolescence [sic]" who responded aggressively when authority was imposed on his conduct.

The jury accredited the State's witnesses and found Defendant guilty of first degree premeditated murder and first degree felony murder as well as theft of property. Defendant now appeals his convictions arguing that the evidence was insufficient to support a conviction for first degree murder; that the trial court erred in not granting a new trial because of improper juror conduct; the trial court erred in not suppressing the letter written by Defendant while in juvenile

detention; and the juvenile court erred in transferring Defendant to stand trial as an adult. We have carefully considered the issues raised by Defendant, the arguments of counsel and the entire record in this matter. Based on this review, we affirm the judgment of the trial court.

### c. Sufficiency of the Evidence of Premeditation

Although Defendant does not deny killing the victim, Defendant contends that the evidence is insufficient to support a finding of premeditation. Defendant argues that he suffers from chronic depression, a mental disease, which, coupled with the long standing physical and verbal abuse received from his father, rendered him incapable of forming the necessary mental state for first degree murder. Defendant also submits that his intellectual and emotional immaturity impaired his ability to fully appreciate his actions. We respectfully disagree and find that the evidence is sufficient to support the jury's verdict of first degree murder.

A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983), *cert. denied,* 465 U.S. 1073, 104 S. Ct. 1429, 79 L. Ed. 2d 753 (1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997), *cert. denied* ,523 U.S. 1083, 118 S. Ct. 1536, 140 L. Ed. 2d 686 (1998). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In reviewing the sufficiency of the evidence, this Court must determine whether, in the light most favorable to the prosecution, a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally when "the person's conscious objective or desire [is] to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." *Id.* -13-202(d). "Premeditation" means that the intent to kill must have been formed prior to the killing itself. It is not necessary, however, that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id.*

In Tennessee, a homicide, once established, is presumed to be second degree murder, and the State bears the burden of proving the element of premeditation in order to elevate the offense to first degree murder. *See State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999), *cert. denied,* 531 U.S. 837, 121

S. Ct. 98, 148 L. Ed. 2d 57 (2000); *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). The existence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000); *Bland*, 958 S.W.2d at 660. Factors which may be indicative of premeditation include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. In addition, evidence showing that the accused lay in wait for his victim strongly suggests premeditation. *See State v. Bullington*, 532 S.W.2d 530, 542 (Tenn. 1976); *State v. Halake,* 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001).

Several witnesses attested to the fact that Defendant had suffered both physical and verbal abuse at the hands of his father, and the various tests performed on Defendant indicated that his mental and emotional profile was more representative of a twelve- to fourteen-year-old than a seventeen-year-old. Dr. Brown stated that this history, coupled with his chronic depression, impaired Defendant's decision-making and planning capabilities. For a person suffering from chronic depression, Dr. Brown explained, options are perceived as limited and such a person might react in an "emotional burst" to situations which others might simply "shrug off." During his testimony, however, Dr. Brown defined "diminished capacity" as a clinical term denoting an impaired ability to make decisions, to make plans, and to adequately carry out the intended plan. This definition is not quite in line with the legal definition of "diminished capacity" in the context of first degree murder. Dr. Brown did not dispute that Defendant made a decision, followed by a plan that was executed. Rather, in Dr. Brown's view, a person exhibiting a diminished capacity for decision making and planning skills means that the process by which he or she engages in such activities is in some way impaired as, for example, an inability to see all of the options that may be available, or a tendency to overrate a threat in a particular situation. Under his definition, Dr. Brown admitted that the criminal population as a whole was more likely to display a diminished capacity than the general population.

The concept of diminished capacity is not a defense, but a rule of evidence by which a defendant may introduce testimony as to a mental disease or defect which, although not rising to the level of an insanity defense, tends to negate the mental state required of a crime. *State v. Phipps,* 883 S.W.2d 138, 143 (Tenn. Crim. App. 1994); *see also Hall*, 8 S.W.3d at 688-89. A defendant's diminished capacity to form the offense's requisite intent does not excuse his or her conduct, but rather attempts to show that the accused is guilty, not of the crime charged, but of a lesser included offense. *Id*. at 688. The psychiatric testimony relied upon by the accused must show that the accused "lacked the capacity to form the requisite mental culpability" because of a mental defect or disease. *Id.; State v. Perry*, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999).

This Court has previously described "the exercise of reflection and judgment" upon which premeditation is predicated as a fixing of one's thoughts upon murdering the victim and forming an opinion or conclusion from those thoughts. *State v. Holton*, No. M2000-00766-CCA-R3-DD, 2002 WL 1574995 (Tenn. Crim. App., Nashville, July 17, 2002). The fact that a defendant's judgment

and thought processes may be adversely impacted by a mental disease or defect does not necessarily render the defendant incapable of premeditation. *State v. Holder*, 15 S.W.3d 905, 913 (Tenn. Crim. App. 1999) ("This Court may not assume that a defendant suffering from paranoid schizophrenia accompanied by delusions is necessarily incapable of premeditated murder.").

Contrary to Defendant's position, Dr. Brown did not testify that Defendant lacked the capacity to premeditate, that is, fix his thoughts upon murdering his father and form a decision based on those thoughts. Instead, the evidence shows that Defendant and Mr. Crawford first discussed killing Defendant's father two weeks prior to the actual killing. During their three-hour walk from Mr. Crawford's home to Defendant's that Tuesday night, the plan was resurrected. Although Defendant first tried to run away in his father's car, he and Mr. Crawford reverted to their original plan to kill Mr. Roland when Mr. Crawford could not start the car. Defendant selected a gun, loaded it, and carried it with him to his bedroom where he and Mr. Crawford settled in for the night to await Mr. Roland's return. When Mr. Roland arrived the next morning, Defendant unlatched the front door and walked back to his bedroom, leaving the door ajar six or eight inches so that he could watch his father's progress. Defendant knew that his father always removed his shoes by the front door and then came down the hall to Defendant's bedroom to check on his son. Defendant sat on the edge of his bed waiting with the gun in his arms. When his father opened the door, Defendant pointed the gun, closed his eyes, and pulled the trigger.

Afterwards, Defendant and Mr. Crawford pulled Mr. Roland's body into the living room and covered it with a sheet. After unsuccessful attempts to wash the blood off the premises, Defendant showered, locked the front door and climbed out of his bedroom window. He and Mr. Crawford drove off in Mr. Roland's truck. They stopped once for gas and soda and then a second time for super glue to fix the truck's rear view mirror.

Dr. Brown testified that Defendant's ability to plan successfully was impaired, not his capacity to form a prior decision to kill his father. Diminished capacity in the legal sense does not mean an inability to plan well, but an incapacity to form the requisite premeditation necessary to sustain a conviction for first degree murder. Dr. Brown also testified that Defendant appreciated the nature and wrongfulness of his conduct, a factor which implies that Defendant engaged in some form of judgment and reflection prior to killing Mr. Roland. *Holder*, 15 S.W.3d at 918. A jury is not required to accept expert testimony to the exclusion of all other evidence. *State v. Nesbit*, 978 S.W.2d 872, 886 (Tenn. 1998), *cert. denied,* 526 U.S. 1052, 119 S. Ct. 1359, 143 L. Ed. 2d 520 (1999); *Holder*, 15 S.W.3d at 912.

Viewing the evidence in the light most favorable to the State, a rational juror could have determined beyond a reasonable doubt that Defendant was capable of premeditation. Defendant is not entitled to relief on this issue.

**d. Improper Contact with Juror**

Defendant next alleges that the trial court erred in not granting a new trial following the discovery that one of the jurors had roomed with his father, the court officer in charge of the jury sequestration, at a local motel during the course of the trial. John James, a deputy sheriff for Rhea County, was the officer in charge of the sequestered jury. During individual voir dire, one of the potential jurors, Jason James, disclosed that Officer James was his father. Both the prosecution and the defense questioned Mr. James about the effect of this relationship on his role as juror. Defendant's counsel posed the following questions:

> MR. HARMON: All right. Your dad is a sheriff's deputy?
> MR. JAMES: Yes.
> MR. HARMON: I know your dad real well and get along with him just fine. But I have to ask the question, because there will probably be several law enforcement people testifying in this case and as far as what they found or saw and things like that. The fact that your dad does work with the sheriff's department, do you feel like you would be giving any more weight to police officers or deputies, sheriff's deputies, than you would just anybody else on the street?
> MR. JAMES: No.
> MR. HARMON: And you realize they're human like us and have good days and bad days?
> MR. JAMES: Yes.

At the time of the juror's voir dire, the decision as to which court officer would be appointed to supervise the jury had not yet been made, but defense counsel was aware that it was a possibility. Following the questioning of Mr. James, the State asked if the trial court wished to take up the issue of Mr. James' relationship to the court officer, but the trial court postponed further discussion pending Mr. James' selection as a juror. No further discussion on the issue, however, took place. Defendant did not object to Mr. James' selection as a juror or object when Officer James was appointed to supervise the jury.

At the conclusion of each day's testimony, the jury was escorted to a local motel where they spent the night under the supervision of Officer James and Officer Kim Russell. Due to budgetary concerns, one of the court officers was required to room with a juror during the trial. Officer James decided he would let Officer Russell have a room to herself and chose to room with his son, Jason James, for the two nights occupied by the trial. A week or two after the trial, Defendant's counsel ran into Officer James at the courthouse and discovered that Officer James and his son had roomed together. Defendant raised the issue of improper contact with a juror in his motion for a new trial. During the hearing on Defendant's motion, both Officer James and his son, Jason, were questioned about any conversations which transpired between them while sequestered at the motel. Officer James and Jason James each testified that they had not discussed the case at all. Officer James said that his son told him that he did not want to talk about the facts of the case because he wanted to do a good job as a juror. At the conclusion of the hearing, the trial court denied Defendant's motion for a new trial on this issue.

The constitutionally guaranteed right to a trial by an impartial jury "requires that the jury be free of even a reasonable suspicion of bias and prejudice." *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). Although a relationship between a juror and a law enforcement official standing alone does not present an inherently prejudicial situation, a juror's unexplained conversation with a third party, including an officer of the court, is good cause for a new trial. *State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984); *Taylor*, 669 S.W.2d at 699; *see also Gonzales v. State*, 593 S.W.2d 288, 291 (1980). When evidence is presented to show that a private extra-judicial conversation with a juror occurred, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or show that the conduct was harmless. *Blackwell,* 664 S.W.2d at 689; *State v. Parchman*, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997). In order to shift the burden to the state to show that a particular communication was harmless, however, the threshold question is whether the communications between Officer James and his son were prejudicial to Defendant. *Parchman*, 973 S.W.2d at 612.

In this instance, there is no evidence that any improper conversations were conducted between Mr. James and his father nor did any other juror testify as to any bias or prejudice. Defendant was required to show that the two men engaged in more than normal pleasantries or idle conversation of extraneous matters. *See State v. Pappas*, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987). Officer James was an officer of the court charged with the responsibility of keeping the jury separate and apart from everyone else, and there is no indication in the record that he was anything but diligent and successful in his charge. While the better decision might have been for Officer James to avoid rooming with any juror, much less his son, the sleeping arrangements should not have unduly surprised Defendant who was aware from the beginning of the relationship between the juror and the court officer. Jurors may be separated into different motel rooms during a sequestration so long as they are under the supervision of a court officer. *State v. Bouderant*, 4 S.W.3d 662 (Tenn. 1999) (citing *State v. McClain*, 667 S.W.2d 64 (Tenn. 1984)). Further, Defendant could have easily prevented the situation by objecting to either the selection of Mr. James as a juror or the appointment of Officer James as the court officer in charge of sequestration. Generally, an appeal is not available to those who do not object to errors at trial or who fail to take any reasonable steps to nullify or prevent the harmful effect of an error. Tenn. R. App. P. 36(a); *Ezell v. State*, 413 S.W.2d 678, 681 (Tenn.1967). Defendant has not carried his burden of showing that there were any prejudicial comments conveyed to Jason James as a member of the jury. Defendant is not entitled to relief on this issue.

### e. Motion to Suppress

While Defendant was in a holding cell at the juvenile detention center, he wrote a letter to his girlfriend outlining the sequence of events leading up to his arrest and confessing to the murder of his father. Defendant argues that the trial court erred in denying Defendant's motion to suppress the letter. Defendant contends that the introduction of the letter violated Defendant's right against self-incrimination and right of freedom from governmental intrusion guaranteed by the Fourth and Fifth Amendments of the United States Constitution and Article I, §§ 7 and 9 of the Tennessee Constitution.

At the suppression hearing, Defendant testified that he was told by one of the detention officers that he would be permitted to write a letter if he wished. Defendant requested, and was provided, a sheet of paper, a pencil and an envelope for that purpose. Defendant said that he placed his letter in the envelope, wrote down his friend's address and sealed the envelope. He then handed the sealed envelope to Rita Spears who told him the envelope would be stamped and mailed. Defendant said that he did not see any posted notices regarding the mail procedures used by the detention center and did not expect anyone to read his private mail.

David McEntire, a detention officer at the center, testified that detainees are permitted to write two letters a month, on Tuesday and Thursday of each week. When Defendant said that he wanted to write a letter, Officer McEntire handed him a piece of paper, a pencil and an envelope. He told Defendant to write the recipient's address on the outside of the envelope and return it to him unsealed. After Defendant was finished with his letter, Officer McEntire testified, Defendant handed him the unsealed envelope but did not write the recipient's address on the envelope. In accordance with the policies and procedures of the juvenile detention center, Officer McEntire scanned the letter for security purposes, noted that the contents pertained to the incident for which Defendant was detained, and turned the letter over to the investigators on the case.

The policies and procedures of the Rhea County Juvenile Detention Center regarding mail privileges are as follows:

POLICY: Each Juvenile shall be entitled to <u>TWO</u> County paid letters during his/her stay at the Center. There shall be no limit placed on LEGAL CORRESPONDENCE.
PROCEDURE:
1. Each Juvenile shall be furnished with paper, pencil and envelope, upon their request, for the purpose of personal correspondence.
2. The Juvenile shall return the pencil and completed correspondence to the Corrections Officer in an addressed, <u>UNSEALED</u> envelope.
3. The Corrections Officer on duty shall scan the contents of the envelope for contraband or unauthorized correspondence, such as escape plans, threats, etc. If none is found, the Corrections Officer shall seal the envelope and place in the outgoing box.
4. First Shift Corrections Officer shall insure that any outgoing mail is transported to the Court House for franking and mailing.

The trial court denied Defendant's motion to suppress. In determining that Defendant had no actual, or subjective, expectation of privacy, the trial court specifically credited the testimony of Officer McEntire that Defendant handed him his letter in an unsealed envelope as he was instructed. Further, the trial court concluded that Defendant had no reasonable objective expectation of privacy. The policies and procedures of the juvenile detention center reflected the state's legitimate safety and security interests, and the trial court credited Officer McEntire's testimony that the procedure was applied to Defendant's mail in the normal course of business.

Officer McEntire testified that he did not furnish Defendant with a copy of the procedures regarding mail privileges nor were the procedures posted in the detention center. As a result, Defendant argues that he had a reasonable expectation of privacy in regard to his outgoing mail because he was not informed that all mail was inspected prior to mailing. Although Defendant acknowledges that a jail or prison has a legitimate interest in preventing illegal activity such as escapes and threats, he argues that correspondence may not be seized by means of "coercion, trickery or deceit" relying on this Court's decision in *Hicks v. State*, 480 S.W.2d 357, 359 (Tenn. Crim. App. 1972). He argues that the failure to post warnings that mail would be read deceived him into a false expectation of privacy. Further, Defendant contends that he was wrongly lured into voluntarily handing over what essentially was a confession in violation of his right against self-incrimination.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). Issues of the credibility of the witnesses, the weight and value to be afforded the evidence and the resolution of any conflicts in the evidence are matters entrusted to the trial court. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

The Fourth Amendment of the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Further, Article I, Section 7 of the Tennessee Constitution provides

> [t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Regarding search and seizure issues, the Fourth Amendment does not provide "a general constitutional 'right to privacy.'" *Katz v. United States*, 389 U.S. 347, 350, 88 S. Ct. 511, 19 L. Ed.

2d 576 (1967). Rather, the purpose and intent of Article I, Section 7 and the Fourth Amendment is to "safeguard the privacy and security of individuals against the arbitrary invasions of government officials." *Simpson*, 968 S.W.2d at 779 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967)).

A Fourth Amendment inquiry involves two separate components. *Katz*, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring). First, we must determine whether the individual had an actual, or subjective, expectation of privacy. The second prong examines whether there is an objective expectation of privacy based on a determination of whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *State v. Munn*, 56 S.W.3d 486 (Tenn. 2001) (*citing Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)). A subjective expectation of privacy that society does not regard as reasonable will not invoke Fourth Amendment protection. *See Katz*, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring).

At the time he wrote the letter, Defendant had confessed to the offense, been arrested and was awaiting further developments in a holding cell. Although Officer McEntire's and Defendant's testimony conflicted with regard to the sealing of the envelope, the trial court credited Officer McEntire's testimony that Defendant complied with his specific instructions to leave the letter unsealed. The evidence does not preponderate against this finding. The record also does not support a finding that the officers at the detention center engaged in any deceit. There is no evidence that Officer McEntire lured Defendant into writing a letter, or that he provided any false information concerning the detention center's mail procedures, or that Defendant did anything less than voluntarily write his letter and hand it over to the corrections officer. Defendant has not manifested a subjective expectation of privacy in his correspondence.

Even assuming that Defendant believed his letter would be mailed unread, society does not consider this expectation reasonable. A public jail cell is not the equivalent of one's home wherein one may find constitutional protection, nor does a jail cell share any of "the attributes of privacy of . . . an automobile, an office, or a hotel room." *Lanza v. New York*, 370 U.S. 139, 143, 82 S. Ct. 1218, 1221-22, 8 L. Ed. 2d 384 (1962). An expectation of privacy in a jail cell is not reasonably justified. *State v. Williams*, 690 S.W.2d 517, 524 (Tenn. 1985); *see also State v. Dulsworth*, 781 S.W.2d 277, 284 (Tenn. Crim. App. 1989) ("The Fourth Amendment proscription against unreasonable searches and seizures does not apply within the confines of a prison cell.").

"[T]he policy of maintaining security within a prison facility is a legitimate factor that may bear upon the objective expectation of privacy." *Munn*, 56 S.W.3d at 496. The scrutiny of an inmate's mail has been upheld so long as the inspection is performed in accordance with established prison procedures in furtherance of the State's interest in the safety and security of its employees and inmates. *United States v. Savage*, 482 F. 2d 1371, 1373 (9th Cir. 1973), *cert. denied* 415 U.S. 932, 94 S. Ct. 1446, 39 L. Ed. 2d 491 (1974); *State v. Taylor*, 771 S.W.2d 387, 393 (Tenn. 1989); *Hicks*, 480 S.W.2d at 359.

In *State v. Taylor*, the Tennessee Supreme Court found no Fourth Amendment violation in the seizure of a defendant's correspondence to other inmates who were incarcerated both in the defendant's facility and in another facility. *State v. Taylor*, 771 S.W.2d 387, 393 (Tenn. 1989). Pursuant to the established procedure at the prison facility, all of the defendant's incoming and outgoing mail except for legal correspondence was read to see if defendant posed any security problems. *Id.* at 392. The letters were then copied and placed in the defendant's files. Some of the correspondence addressed to inmates in another facility contained threats against an informant, and the warden of the defendant's prison forwarded the correspondence to his counterpart at the other facility, who in turn gave the correspondence to the investigators in charge of the defendant's case. *Id.* The defendant protested that the introduction of the letters at trial violated his right to be free from unreasonable searches and seizures. The supreme court disagreed finding that the warden had a justifiable purpose in safeguarding the employees and inmates. *Id.* at 392-3. The letters were turned over to the corrections officers in accordance with established prison procedures and policies, and, therefore, Fourth Amendment concerns did not require the suppression of the defendant's letters. *Id.* at 392 (*citing United States v. Savage*, 482 F.2d 1371 (9th Cir. 1973); *Hicks*, 480 S.W.2d at 359.

Defendant argues, however, that his status as a juvenile entitles him to heightened constitutional safeguards under the Fourth Amendment. Specifically, Defendant contends that a juvenile, unlike an adult inmate familiar with prison procedures such as those reflected in *Taylor*, should be personally informed of the detention center's procedures before it can be said that he relinquished his expectation of privacy guaranteed by the Fourth Amendment. Defendant also suggests that a lower threshold of deceit or trickery should be used to determine whether a juvenile voluntarily hands over his letter to a detention officer. Defendant does not cite any authority for his arguments, and these issues are therefore waived. Tenn. R. Crim. App. 10(b). Nonetheless, we find no merit in Defendant's contentions. We have already noted that the evidence does not support any finding of deceit on the part of the detention officer with regard to the mailing of Defendant's letter nor do we find any support for Defendant's contention that "a little bit" of deceit is all that is necessary to violate Defendant's Fourth Amendment rights.

We also disagree that a juvenile facing criminal proceedings is entitled to a higher standard of constitutional protection than that accorded similarly situated adults. Prior to the United States Supreme Court's decision in *In re Gault*, 387 U.S. 1, 87 L. Ed. 2d 527, 87 S. Ct. 1428 (1966), juveniles subject to proceedings in juvenile court were not entitled to the same constitutional protections extended to adults tried in a criminal proceeding. *State v. Jackson*, 503 S.W.2d 185, 187 (Tenn. 1973). Juvenile proceedings were historically described as "civil" rather than "criminal," and the fate of a child accused of a delinquent act was primarily left to the benevolence of the State acting as parens patriae. *Gault*, 387 U.S. at 16, 87 S. Ct. at 1437. This practice proved less than satisfactory over the years, however, and the Supreme Court noted that "unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure." *Id.* at 18, 87 S. Ct. at 1439. The Court concluded that certain basic constitutional rights are as applicable to children as to adults when either is charged with the commission of an offense. *Id.* at 31-57, 87 S. Ct. at 1445-1459 (notice of charges, right to counsel, privilege against self-incrimination, right

to confrontation and cross-examination); *see also In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (proof beyond a reasonable doubt); *Jackson*, 503 S.W.2d at 188 (double jeopardy).

Following *Gault*, our courts recognized that "[i]ncreasingly, constitutional principles designed to protect the rights of individuals charged with crime have been deemed to be applicable to proceedings involving juvenile offenders." *State v. Johnson,* 574 S.W.2d 739, 741 (Tenn. 1978). Children, as well as adults, are entitled to constitutional protection especially when threatened by the State with the loss of physical freedom. *Doe v. Norris*, 751 S.W.2d 834, 839 (Tenn. 1988).

The evolution of constitutional principles within the context of juvenile proceedings, however, does not lead one to conclude that juveniles, by virtue of their youth, deserve more protection than adults. To the contrary, a juvenile who commits an offense that would constitute a felony if committed by an adult is entitled to the same rights as an adult. *Johnson*, 574 S.W.2d at 741. For example, in *Johnson,* the court concluded that a juvenile adjudicated a delinquent, like an adult charged with a criminal offense, is entitled to a jury trial as a matter of right upon a de novo appeal to the circuit court unless expressly waived. *Id.* With respect to the right to access to the court, there is no distinction between an incarcerated juvenile and an incarcerated adult. *John v. Adams*, 969 F.2d 228, 233 (6th Cir. 1992).

Our courts have specifically rejected the argument that a juvenile is entitled to greater constitutional protections than similarly situated adults. In *State v. Callahan*, 979 S.W.2d 577 581 (Tenn. 1998), the defendant argued that a juvenile's confession should be barred from introduction at trial if the defendant is not informed that he may be tried as an adult in addition to his *Miranda* warnings. The court declined to adopt the *per se* exclusionary rule suggested by the defendant and held instead that the same criteria used to determine if an adult's statement is admissible is applicable to a juvenile's confession. *Id.* at 582-83; *see also State v. Turnmire*, 762 S.W.2d 893, 896-97 (Tenn. Crim. App. 1988); *Braziel*, 529 S.W.2d at 506.

In *State ex. rel. Gillard v. Cook*, 528 S.W.2d 545, 549 (Tenn. 1975), the defendant argued that "the structure of the juvenile system requires a higher level of due process for juveniles than adults, and proof beyond a reasonable doubt is necessary [in revocation hearings] for the protection of the juvenile." The court disagreed, concluding that "[t]he juvenile is certainly entitled to the same standard of proof as an adult, but we do not feel that due process accords him a higher standard."

The evidence does not preponderate against the trial court's finding that Defendant's Fourth Amendment rights were not violated by the introduction of the letter into evidence. Defendant is not entitled to relief on this issue.

We also disagree with Defendant's argument that the introduction of the letter's contents violated his right against self-incrimination under the Fifth Amendment. Contrary to Defendant's assertions, there is no evidence that Defendant was tricked or deceived into handing over his letter in an unsealed, unaddressed envelope. *See Hicks*, 480 S.W.2d at 359. Voluntary statements freely

given are not barred from introduction into evidence by the Fifth Amendment. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Based on its determination of the credibility of the witnesses, the trial court found that Defendant had voluntarily handed his letter over to the corrections officers in an unsealed envelope, and the evidence does not preponderate against this finding. Defendant is not entitled to relief on this issue.

**f. Transfer from Juvenile Court**

Defendant, who was seventeen at the time of the offenses, next argues that the Rhea County Juvenile Court improperly transferred Defendant to be tried as an adult. Specifically, Defendant contends that the trial court failed to properly consider the sparseness of Defendant's prior record, the absence of proof that past rehabilitative efforts had failed and whether Defendant's rehabilitation was possible utilizing the services and facilities currently available as required by Tennessee Code Annotated section 37-1-134(b). As Defendant notes in his brief, the transcript of the transfer hearing is less than perfect, with significant portions omitted because apparently the transcriber could not understand what was being said. Nonetheless, for the reasons discussed below, we disagree with Defendant's contentions.

A child charged with a criminal act who is sixteen years of age or more will be treated as an adult if the court finds that there are reasonable grounds to believe that: "(A) [t]he child committed the delinquent acts as alleged; (B) [t]he child is not committable to an institution for the developmentally disabled or mentally ill; and (C) [t]he interests of the community require that the child be put under legal restraint or discipline." *Id.* -134(a)(4(A) - (C). When making the determination of whether or not to transfer the juvenile to be dealt with as an adult, the juvenile court must consider the following factors: "(1) [the extent and nature of the child's prior delinquency records; (2) [t]he nature of past treatment efforts and the nature of the child's response thereto; (3) [w]hether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (4) [w]hether the offense was committed in an aggressive and premeditated manner; and (5) [t]he possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state. *Id.* -134(b)(1)-(6) (Subsection (6) involves consideration of gang related conduct and is not relevant here.).

On appeal, this Court must determine whether there were reasonable grounds for the juvenile court to believe that the criteria listed in Tennessee Code Annotated section 37-1-134(a)(4) were present in this case. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975), *cert. denied*, 429 U. S. 805, 97 S. Ct. 38, 50 L. Ed. 2d 65 (1976), *superceded by statute as stated in State v. Lundy*, 808 S.W.2d 444 (Tenn. 1991); *State v. Layne*, 546 S.W.2d 220, 224 (Tenn. Ct. App. 1976). At the conclusion of the hearing the juvenile court found that there were sufficient grounds to transfer Defendant to the criminal court to be tried as an adult "based upon the statute and the content as required in 37-1-134." The judge also noted that he had observed the demeanor and attitude of both Defendant and Mr. Crawford during the proceedings and found that both young men displayed a total lack of appreciation for the seriousness of their predicament. Although the trial court did not discuss

which facts he was specifically relying on to conclude that the three criteria were met, the record presents a reasonable basis for determining that the necessary factors existed.

The testimony concerning the commission of the offense was similar to that presented at trial and included the confessions of both Defendant and Mr. Crawford. The requirement that a juvenile's confession be corroborated in whole or part by other evidence in order to sustain an adjudication of delinquency is applicable to transfer hearings. Tenn. Code Ann. § 37-1-134(a)(2), -127(e). The major details contained within the confessions were corroborated by the testimony of David Emiren, an investigator on the case. We agree with the juvenile court that at the time of the transfer hearing, there were reasonable grounds to believe that Defendant committed the offense.

There is also no indication in the record that Defendant was so developmentally disabled or mentally ill that he was committable to an institution. To the contrary, Defendant was evaluated by a mental health center prior to the transfer hearing and found competent to stand trial.

Defendant's primary objection to his transfer to criminal court is his belief that he should have been extended the opportunity for rehabilitation through the juvenile system. In support of his position, Defendant points to his lack of an extensive prior record and the successful completion of a probation period prior to the commission of the offense. Contrary to Defendant's assertion that the juvenile court did not consider these factors, extensive testimony was presented concerning Defendant's prior history and the programs and facilities available to Defendant if the juvenile court were to retain jurisdiction. Weighed against these factors, however, are the seriousness of the charges against Defendant, the nature of the offenses, and the manner in which the offenses were carried out. Taking into consideration also that Defendant was only about six months short of his eighteenth birthday at the time of the offense, we agree with the juvenile court's finding that the interests of the community required Defendant to be put "under legal restraint or discipline," and treated as an adult.

The evidence offered at the transfer hearing was more than sufficient for the juvenile court to have reasonable grounds to believe that Defendant had committed the offenses, that he was not committable, and that the community's interest required him to be put under legal restraint or discipline. Defendant is not entitled to relief on this issue.

## CONCLUSION

Following a through review of the record in this matter, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE